## STEVENSON, RESPONDENT, *v.* GELSTHORPE, APPELLANT.

DAMAGES—*Negligence—Physicians.*—In an action for damages against a physician for negligent and unskillful treatment of a fracture of plaintiff's wrist, it appeared that the defendant used simple and common appliances in treating the injury; that a physician *called on behalf of plaintiff* testified that he had examined plaintiff's wrist; that he could not say that anything was the matter with it; that there was some stiffness and tenderness; that the bones and wrist seemed to be in proper place, and were in such good apposition that it was almost impossible to tell whether there had been a fracture; that, assuming that plaintiff had sustained a Collee's fracture, it was a good job; that he could see nothing wrong with the treatment or any indications of negligence; that he thought the wrist was only badly sprained; that the use of pasteboard splints was proper. Another physician called by plaintiff testified that he concluded that the injury was a Collee's fracture. In answer to the question as to whether "ordinary care and treatment would have called for different appliances than those used by defendant, assuming that plaintiff had suffered a severe Collee's fracture of his wrist," the witness said that "if it was a very severe fracture possibly he could not have any splints on it at all;" that he had found the bones in plaintiff's wrist in perfect apposition; that perfect recoveries from such injuries were very few. That witnesses called as experts by defendant approved of the treatment and appliances used by defendant, and testified that the bones of plaintiff's wrist were in perfect apposition; that the rotation of the wrist was natural; that if the injury was a Collee's fracture the restoration was extraordinary. *Held*, that a verdict for plaintiff for the sum of five hundred dollars was entirely unsupported by the evidence.

EVIDENCE— *Reputation.* — In an action against a physician for damages for negligence in his treatment of a particular case, evidence as to his reputation for skill and ability is incompetent.

*Appeal from Eighth Judicial District, Cascade County.*

The cause was tried before BENTON, J. Plaintiff had judgment below.

*Taylor & McCord,* and *F. A. Merrill,* for Appellant.

*Baum & Bishop,* for Respondent.

HARWOOD, J.—This is an action for the recovery of damages. Plaintiff averred in his complaint that in the month of October, 1889, while plaintiff was engaged in mining coal at Sand Coulee, in the county of Cascade, this State, he sustained, by accident, a grievous injury to the wrist joint of his left arm; that at said time and place defendant was a physician and surgeon, practicing his profession, and plaintiff called defendant as such physician and surgeon to set, dress, bandage, and medically treat the said broken and injured limb, which defendant undertook and proceeded to do. But that defendant "so negligently and unskillfully conducted himself in setting and attempting to set and heal said arm, wrist, and hand, that said wrist become crooked, and the bones therein are out of place, and the fingers upon said hand are stiff and weak, and so remain, and will remain during the lifetime of plaintiff;" whereby plaintiff alleged that he was damaged in the sum of five thousand dollars, for which he demands judgment.

On the trial of the cause the jury returned a verdict in favor of the plaintiff for the sum of five hundred dollars, and judgment was thereupon rendered against defendant for that sum and costs.

Defendant sought a new trial, on the ground, among others stated, of insufficiency of evidence to justify the verdict. The court below overruled the motion, and defendant appealed from that order and the judgment, and has brought here for review the evidence, urging upon the attention of this court the one ground upon which he relies for setting aside said verdict and judgment, namely, that the verdict is not supported by evidence.

The record before us contains all the evidence given upon the trial, and it appears therefrom that appellant is fully sustained in his assignment of its insufficiency to justify the verdict against him. There is no evidence in this record to support a finding by the jury that defendant had been negligent, unskillful, or careless in his professional treatment of said injury; nor that the result to the injured limb, through such treatment, was less beneficial than is attained by the most careful and skillful treatment known to the medical profession. On the contrary, the plaintiff introduced testimony of practicing physicians, tending to prove, not only that the treatment and appliances used by defendant were approved by medical writers of eminence and authority in that science; but that the benefit resulting from such treatment was all that could be expected in any event, and was extraordinary in its beneficial result, if plaintiff's injuries were as severe as contemplated by the hypothetical question put by plaintiff's counsel.

Such was the state of the proof when plaintiff rested his case. Had defendant's counsel, at this juncture, moved the court for a nonsuit, we can see no reason why the court would not have granted such motion. But the defendant did not move therefor. It may be he desired the submission of the case to the jury, expecting exoneration by a verdict at the hands of the jury.

On the trial the plaintiff and some other witnesses called on his behalf first narrated the events relative to the happening of the injury, the summoning of defendant, and his conduct in regard to setting and dressing the injured limb, and his treatment thereof afterward. In the narration of those facts, nothing is shown tending to prove whether defendant's conduct in the treatment of the injury was careful, appropriate, and skillful, or the contrary.

It appears from the evidence and argument of plaintiff's counsel that because the doctor, in this age of extraordinary advancement and invention, used simple and common appliances in dressing the wounded arm, they concluded he was wanting in skill and proper care in his treatment of the case. The physician is under an implied obligation, when he undertakes to treat diseases or injuries, to bring to his aid such obtainable remedies and appliances as discovery and experience have found

to be the most appropriate and beneficial in aiding recovery. But in some cases the best and most appropriate appliances or remedies may be very simple and commonplace, and it may be the highest type of skill which applies these simple things to aid nature in its healing processes.

The plaintiff in describing the manner in which defendant dressed his injured arm said: "He called for pasteboard, and there was a basin full of milk-warm water, and he took the pasteboard and cut it up in two pieces and put one on each side, and put a lot of cotton under them next to my hand, then he took a cotton strip and tied that hand up; I cannot just say how close the strips were to my elbow; he waited on me right along; he took the splints off when the time came to take them off; and he took them off once and looked at the hand eleven days between, and then put them back."

This is a fair sample of the testimony of plaintiff's witnesses as to how the defendant treated the injured arm. It was reserved to those witnesses, learned in the science of medicine and surgery, and experienced in the treatment of such cases, to give the necessary evidence as to whether the treatment described was proper and skillful or negligent and unskillful, and whether good or injurious results flowed therefrom.

Such experienced witnesses were called by plaintiff. The first was Dr. George Cummings, who testified in effect as follows: "I reside in Great Falls; have resided here only four months; have made examination of the plaintiff's left wrist and arm; as far as the forearm is concerned, I cannot say positively that there is anything the matter of it; as far as the wrist is concerned, there is some stiffness and tenderness there; the bones and wrist seem to be in proper place as far as my judgment goes; the bones are in such a good apposition that it is almost impossible, in my judgment, to tell whether there has been a fracture or not. The treatment recommended for a dislocation of the forearm or wrist would be about as follows: After having re-adjusted the dislocation, I should either put it up in anterior or posterior splints, or in a pistol-shaped splint; I let the splints go up as far as the elbow and to include the hand, leaving the hand at the fingers so that they could be seen; I should pad the splints well, and put no bandage over the skin

underneath the splints; and by splints, I mean splints made
out of pasteboards or leather.   There are a great many things
you can make splints out of — most anything; you can take rye
straw even, or paper may be; plaster of Paris is recommended
very highly, but there is a good deal of danger in its use from
swelling; the main thing is to keep it in a fixed position.    I
have been practicing since 1888 in Colorado and Great Falls;
I came here on the 5th of April; I have not treated any fract-
ure or dislocation since I came here; about two months before
I came here I had a Collee's fracture, which is a fracture of the
radius of the forearm; I had one Collee's fracture about six
months before that; I have had five cases since I graduated,
with one of them especially I had considerable trouble.   A
Collee's fracture is considered one of the most difficult ones
in all the fields of surgery of fractures or dislocations to cure
properly.   Whenever there is a Collee's fracture there will prob-
ably be a partial dislocation, but not sufficient to cause the escape
of the synovial fluid.   In this case I doubt if there was either
a dislocation or a Collee's fracture; I think the wrist was only
badly sprained.   The plaintiff, when he came to me for exami-
nation, said he had dislocated his hand; that he had fallen for-
ward on his hand and dislocated it; and he also said that the
doctor said that there was a fracture of the bone.   The only
statement that I made of anything else was that it was a great
deal better than no wrist at all; I didn't state to him that it was
not a good job.   Assuming that it was a fracture of his wrist,
and a dislocation or Collee's fracture, I think it was a good job.
Assuming that the plaintiff in this action had sustained Collee's
fracture, or dislocation of the wrist, or sprain concerning which
we have been telling, I will state that there are no indications
in the treatment of it as though there had been any negligence
on the part of the physician who treated it.   I cannot see any-
thing wrong with the treatment.   If the plaintiff, within three
or four months after his injury, was attacked with inflammatory
rheumatism, the condition of the system which developed rheu-
matism would most assuredly have an effect in producing stiff-
ness in the injured joint.   If the rheumatism mentioned began
in the feet and extended up to the knees, it may affect some
other part of the body.   It would naturally affect that portion

of the body that had lost some vitality. It usually goes to some weaker portion. Rheumatism might affect without being indicated to the naked eye. Assuming that the injury is such as we have stated, viz., what is called Collee's fracture, I think the result has been very good. I never read of any case of Collee's fracture where the person recovered fully; there have been no perfect recoveries. They can never recover the same as they were formerly, though they can use the arm in time. I cannot recall a case of injury from Collee's fracture that has sufficiently recovered so that the arm could be used for all practical purposes. There are several treatments of Collee's fracture. A dozen different kinds of splints. No two physicians use the same kind of splints. They have their particular choices. We may use the anterior or posterior splint, pistol-shaped splint, or we may use most any material. It would be proper to wet the pasteboard strips used for splints, if they were not made too wet; just dipped in water once and placed right on the hand, you would gain the advantage of having them to fit the arm; to become molded to the arm. The objects of placing splints on fractures of this kind is to keep them at rest. In some cases, some eminent physicians have recommended treatment without splints of any kind. You can mold the pasteboard, after having wetted it, to the arm, and hold it there with bandages. The success of the treatment, when using pasteboard and cotton, would depend upon the manner the cotton was put on. It would have to be put on even. It doesn't make any difference whether the splint is made of pasteboard, wood, tin, or zinc, or what, as long as you accomplish the result. Why, if you were in the harvest fields you take straws; it wouldn't make any difference, the desired result would be just the same as though you had used the best splint recommended. There are several authorities that recommend pasteboard splints; they are as good as can be used."

Dr. Gordon, a practicing physician, resident at Great Falls, Cascade County, was also called as a witness on behalf of plaintiff. He testified in effect that he was acquainted with plaintiff; had been called upon by plaintiff for an examination of his injured arm, and he made examinations thereof. From his examination he concluded the injury was the result of a Collee's fracture. He described the proper treatment for such an injury

very much as Dr. Cummings described the same. In answer to the question by plaintiff's counsel, as to whether "ordinary care and treatment would have called for different appliances than those used by defendant, assuming that the plaintiff had suffered a severe Collee's fracture of his wrist," Dr. Gordon replied that "if it was a very severe fracture possibly he could not have any splints at all on it." This witness testified that he could not say anything about the treatment of plaintiff's injured arm, by defendant, because he did not know what the treatment was. But he said that at the time he made examination of plaintiff's injured wrist he found the bones in "perfect apposition"; that plaintiff could freely use his fingers, as far as the witness could remember. In speaking of Collee's fracture, Dr. Gordon said the cases of perfect recovery from such an injury were very few.

Neither of the two physicians called by plaintiff gave any testimony tending to show that defendant had treated plaintiff's injury in a careless, negligent, or unskillful manner, nor that the result of the treatment was injurious. The tendency of the testimony of these experienced witnesses for plaintiff was to contradict the allegations of plaintiff's complaint. But if this was not sufficient to satisfy the jury, they had the testimony of eight other practicing and experienced physicians called on behalf of defendant, who were fully informed of the treatment of plaintiff's injured arm, by defendant, and who had made, or witnessed, an examination of said injured arm. These doctors agreed in this instance, and testified with one accord that the treatment and appliances used by defendant in the case in question was such treatment as is recommended by medical writers of authority, and approved as beneficial and proper, by the experience of the witnesses in like cases. It was further shown by these witnesses that the bones of plaintiff's injured wrist were in perfect apposition; that the wrist-joint, arm, and hand of the injured limb had been so nearly restored to normal proportions that the eye could detect no difference, and if by measurement any could be found, it was extremely slight. These doctors testified that if the plaintiff had sustained a Collee's fracture of the wrist in question, the restoration, so far as it had progressed, was extraordinary.

The plaintiff claimed that his fingers were stiff; that he could not straighten them; that his wrist joint had healed in such a way as to hold his forearm and hand in a crooked position; and that he could not raise the injured arm and hand to his head without lifting it with his right hand. But the doctors who examined the injured limb, and testified on behalf of defendant, said they found that the rotation of the wrist and finger joints was natural; that no result of the injury could have disabled plaintiff's arm so that he could not raise that hand to his head without assistance of the other hand. Several of these doctors testified that they had observed plaintiff while on the witness stand, and while his attention was somewhat distracted under cross-examination, raise the injured hand to his head without assistance, and also let his stiffened fingers relax to a straight and natural position, and also saw the injured wrist and hand relax to a natural position, and the stiff and injured fingers "fumble" in a natural, yet an unconscious manner, upon plaintiff's knee. One physician testified that he had observed the plaintiff go down the street in Great Falls, with his injured hand and fingers hanging and swinging in a natural manner; and immediately afterward had seen the plaintiff pass along holding the injured limb in the stiff manner in which he claimed it had grown. Plaintiff did not deny that these peculiar changes and movements of the injured limb had actually happened as described by witnesses; but he testified in rebuttal, that he "was not shamming."

The verdict of the jury is entirely unsupported by evidence necessary to sustain it.

In the trial of this case the court allowed, over the objection and exception of defendant's counsel, certain witnesses to testify as to defendant's reputation, at Sand Coulee, for skill and ability as a physician. This was clearly improper. Defendant's reputation as a physician was not in issue. It was his specific acts in the treatment of a certain case, and the facts as to whether his acts were unskillful and negligent in this treatment was the matter in issue. A doctor's reputation for skill and ability will not exonerate him where gross negligence and want of the application of skill is alleged and proved. Nor can the fact that a doctor is reputed to be negligent or unskillful be allowed

as proof to establish negligence or unskillful treatment in a particular case, because he may have treated that case with unusual skill and care. The introduction of that evidence was not only improper from a legal view; but it was of a character which may have unjustly prejudiced defendant's case, before the jury, upon a point where defendant had made no preparation to defend. It is likely such improper evidence misled two thirds of the jury who concurred in the verdict.

Judgment is reversed and new trial granted at the cost of respondent.

BLAKE, C. J., and DE WITT, J., concur.