## CHARLESTON.

GEORGE F. BROWNING, AN INFANT, v. C. S. HOFFMAN et al.
PARTNERS, ETC.

Submitted April 27, 1920.    Decided May 11, 1920.

1. NEW TRIAL—*Where Costs Are not Paid as Required, Court Need not Set Aside Grant of New Trial.*

    Although the requirement of payment of the costs of a trial, before the first day of the next regular term of a court, imposed as a condition subsequent, on the granting of a new trial, has not been complied with, the court is not bound to set aside the order granting the new trial. It has discretion to let the order stand and award an execution for the costs, and, if payment is tendered in resistance of a motion to set it set aside, may let it stand, without issuance of an execution. (p. 470).

2. APPEAL AND ERROR—*Where Verdict is Bad for One Tenable Ground, Appellate Court Will Not Inquire Into Sufficiency of Another Ground.*

    If a verdict is erroneous and has been set aside for excessiveness and an additional reason, and the latter ground is tenable, the appellate court will not enter upon an inquiry as to whether an effort to cure the first named defect, by a remittitur, is sufficient or was made in time.(p. 478).

3. NEW TRIAL—*May be Awarded on Motion or Ex Mero Motu for Erroneous Instruction not Objected to.*

    A trial court may, *ex mero motu*, or on the motion of a party to the action, award a new trial on the ground of error in the giving of an instruction unobjected to and, as to the giving of which, no exception was taken, or upon any other valid ground. (p. 470).

4. PHYSICIANS AND SURGEONS—*Surgeon not Negligent in Using Approved Treatment.*

    If a surgeon adopts, in the treatment of a case, a method established and approved by physicians and surgeons generally, in the community in which he performs the operation or gives the treatment, at the time thereof, and is not negligent or careless in its application, he is not liable for injuries caused by such treatment. (p. 475).

5.   SAME—*Surgeon not Bound at His Peril to Adopt Best Method of Treatment.*

If there are two or more approved methods of treatment of an injury of the kind committed to his care, he may adopt the one which, in his honest opinion, will be the more efficacious and appropriate under all of the circumstances, and, in such case, he is not liable for an injury resulting from an error in his judgment, if there be one. He is not bound at his peril to adopt the best method. (p. 475).

6   SAME—*Other Method of Treatment Than That Used Held Inadmissible.*

In an action for malpractice by a physician or surgeon, it is error to admit evidence of a method of treatment, antedating the treatment involved, by a long period of time, and differing materially from the method adopted in the treatment and generally approved and used at the time thereof. (p. 475).

7.   SAME—*When Method of Treatment Employed Was Clearly Proper, Instruction on Negligence in Adopting Method is Erroneous.*

The propriety of the use of a plaster-paris cast in the treatment of a compound comminuted fracture of the leg, having been established by uncontradicted evidence, in a case in which a surgeon is charged with malpractice in the treatment of the wound, it is error to give an instruction based upon the hypothesis of negligence in the mere adoption and use of this method, even though an injury has followed, which might have resulted from use thereof in an improper manner. (p. 475).

8.   SAME—*Instruction Founded in Assumption of Evidence of Incompetency and Negligence of Day and Night Nurses Held Error.*

If, in the trial of such a case, incompetency of the nurses is relied upon, and no evidence has been adduced for the purpose of proving it, except lack of graduation of the day and night nurses, the head nurse being a graduate, and there is no evidence of any omission of, or departure from, the instructions given them, nor of any action or conduct on their part resulting in or causing the alleged injury, it is error to give an instruction founded upon the assumption of evidence of their incompetency and negligence, or either of them. (p. 477).

9.   APPEAL AND ERROR—*Appellate Court, After Finding That Verdict Was Properly Set Aside, Will Not Consider the Sufficiency of the Evidence.*

On a writ of error to a judgment awarding a new trial, the appellate court, after having ascertained that the verdict for the

plaintiff was properly set aside for an error in the trial, other than refusal to direct a verdict for the defendant, if any, will not ordinarily enter upon an inquiry as to the sufficiency of the evidence to sustain the verdict returned and set aside. (p. 478).

(LYNCH, JUDGE, absent).

Appeal from Circuit Court, Mineral County.

Action for malpractice by George F. Browning, an infant, etc., against C. S. Hoffman and others, partners, etc. From an order setting aside a verdict for plaintiff and granting a new trial and a reinstatement of the verdict and judgment thereon after a remittitur filed by plaintiff, plaintiff brings error.

*Affirmed.*

*R. A. Welch, Taylor Morrison,* and *Albert A. Doub,* for plaintiff in error.

*C. O. Strieby, A. Jay Valentine,* and *Chas. N. Finnell,* for defendants in error.

POFFENBARGER, JUDGE:

This writ of error seeks reversal of an order setting aside a verdict for $5,500.00 and granting a new trial, reinstatement of the verdict and judgment thereon for $5,000.00, a remittitur of $500.00 having been filed by the plaintiff.

The verdict was set aside October 2, 1919, on condition that the defendant pay the costs of the trial on or before the first day of the next regular term of the court, which was October 21, 1919. On that day, a motion was made to set aside the order granting a new trial, for failure to pay the costs; but was resisted on the ground of mistake, the check for payment thereof having been inadvertently mailed to Baltimore, Md., instead of Keyser, W. Va. Before this motion was passed on, October 29, the remittitur was filed and another motion to set aside the order of October 2nd made and founded upon the remittitur. Both motions were, overruled, October 29th.

The discretion of the trial court amply justified its action in overruling the first motion. It could have set aside the order for non-payment of costs, or let it stand and awarded an execution for the costs. Code, ch. 138, sec. 5. As payment of the costs was tendered in resistance of the motion, there, was no occasion for such an award.

If the verdict is right, except as to the amount thereof, the remittitur and motion to reinstate the verdict founded thereon may have been filed and made in time. As to this, we express no opinion, however, for there was cause other than excessiveness of damages justifying the award of a new trial. The weight of authority is that such an order may be set aside at the term at which it was entered, on other than statutory grounds. *Rhea* v. *Gibson*, 10 Gratt. 215; *Luke* v. *Coleman*, 38 Utah 383, Ann. Cas. 1913B, 483, note 486; 20 R. C. L. p. 312. The contrary has been held in some states, and the general rule is that the order cannot be set aside at a subsequent term, unless a motion to set aside is made at the term of entry and continued. See the note above referred to and 20 R. C. L. 313.

The verdict was set aside on the ground of an error in an instruction given for the plaintiff, without objection or exception. Right and power in the trial court to set it aside on such ground is denied in argument, but it is explicitly affirmed by authority. *Roane Lumber Co.* v. *Lovett*, 72 W. Va. 328; *Stevenson* v. *Wallace*, 27 Gratt. 77. To make such an error available in the appellate court, an exception is necessary, of course; but the right of any court to correct its own errors in due time stands upon a footing somewhat different from that of the right of a litigant to invoke the jurisdiction of another court to make the correction. This distinction is so obvious and so thoroughly established that citation of authority for it is unnecessary. However, see 20 R. C. L. p. 300.

The cause of action was alleged negligence in the treatment of a severe and complicated wound, in a private hospital owned and conducted by the defendants as partners in business, one of whom personally treated it. The plaintiff, a boy, was only about nine years old, when injured. He suffered a compound comminuted fracture of the right leg, two or three inches from the ankle. While he was riding in a fruit wagon, the horse became frightened, ran away and upset the wagon, and his leg was crushed by it some way. At the suggestion of the family physician, Dr. Bell, he was taken to the hospital the same evening, Monday, November 11, 1918, where Dr. Hoffman, one of the defendants, dressed the wound, with the assistance of Dr. Bell. A piece of bone protruded and the flesh was considerably

torn and lacerated. There may have been some infection, since the stocking, as well as particles of earth, was in contact with the wound. On his preliminary examination, Dr. Hoffman thought the case was really one for amputation, but he desisted from resorting to it, for lack of direction or consent of the parents, none of them being present at the time. Having had considerable experience with that class of cases and having saved limbs in as bad condition, he finally decided to attempt to save the boy's leg. The wound was thoroughly cleansed and disinfected in an appropriate manner, an incision made for replacement of the protruding bone, a loose sliver of bone taken out, the bones set and wired, the incision closed by stitches and the leg put in a plaster cast, with cotton and gauze, and an opening or window left over the wound for drainage, inspection and treatment. Throughout that night and the next day the boy did well, but, the next night, he was delirious and had a high temperature and a weak pulse, and at about 7 o'clock of the second day, Wednesday, November 13th, a change in the condition of the foot was discovered. There was no swelling, but it was slightly cold and had turned slightly white. When this change developed, Dr. Hoffman was not at the hospital nor within reach. He had left at about 9 o'clock Tuesday evening for Huntington, W. Va., in response to a call by the chairman of the Executive Committee of National Defense. Riding at night, he was at Huntington on Wednesday and got back to the hospital at about 2 o'clock, A. M., Thursday. It is admitted that he saw the boy Tuesday morning. He swears he saw him again and examined his leg at about 7 o'clock that evening and found his condition entirely satisfactory. The boy says he saw him only once on Tuesday. In the hospital there were several nurses, and the boy was provided with a day nurse and a night nurse, neither of whom was a graduate, the former having had about nine months training and the latter about eighteen. The head nurse was a graduate and had had several years experience. Before Dr. Hoffman left, he instructed the head nurse to cut the plaster cast, if the leg should start to swell, and, although she says there was no swelling, on Wednesday morning at 8 o'clock she cut it, because she had discovered an unfavorable change and condition, and resorted to approved treatment to

86 W. Va.

increase or restore circulation. In addition to the nurses, the hospital had the services of Dr. Maxwell, a young physician and surgeon whose competency is not impeached, though the relatives of the boy lacked confidence in him on account of his limited experience. His position was that of anesthetist and assistant. He had been associated with the hospital for seven and a half years and had had more than three years previous hospital experience. He says he was notified of Dr. Hoffman's intended absence and advised of the boy's condition. Dr. Hoffman did not notify his partner, Dr. Kalbaugh, at the time of his departure, but he thinks he told him a couple of days before he left that he expected to be away. Dr. Kalbaugh also was away on Wednesday. Dr. Hoffman says the usual interval between the original treatment of a wound of that kind and the first subsequent dressing is about 48 houras, and this is not denied. About 53 hours had intervened between the original treatment and his return from Huntington.

On the discovery of the unfavorable change, the head nurse, in addition to alteration of the treatment, endeavored to notify Dr. Maxwell and was unable to reach him, but at 10:30 A. M., he came to the boy's room on his round of visits to patients, and was informed as to the situation. The treatment adopted by the nurse was then continued, possibly with slight modification. According to his testimony, he visited the boy twice between 10:30 A. M. and 1:30 P. M  When he returned at 2:30 P. M., the condition he found convinced him that amputation was necessary, and he immediately notified Dr. Bell and endeavored to get into communication with members of the family. Dr. Bell thinks he was called about 3 or 3:30, and going to the hospital, he found circulation had ceased and gangrene extended three or four inches above the knee. Before going to the hospital, however, he spent some time in an effort to communicate with the family. Dr. Maxwell says he inquired as to whether any of the family were about the hospital, and, being informed that they were not, went to the house of his parents, and finding nobody there, went to the residence of the grandparents, where he found the boy's aunt. Whether he notified her of the change of condition, he does not say. He claims he told the grandmother, at about 5 P. M., the boy's condition was

serious, but he is not sure he told her amputation was necessary. Upon receipt of that information she left the hospital. He made preparations to operate himself, but did not do so on account of lack of consent of the parents or other relatives, although he knew the boy would die if the operation should not be performed. He gave them no notice of the unfavorable condition discovered on Wednesday morning. He admits there was some swelling at that time, but denies there was any evidence of gangrene. The father of the boy, a railroad man, was away from home at the time, and did not return until about 9 o'clock P. M. He was unwilling to let Dr. Maxwell make the amputation, but was willing to let Dr. Bell do so. A rule of the hospital forbade operations there, by surgeons not connected with it. Arrangements were made to have the operation performed in a hospital at Cumberland, Md., and, at about 2 o'clock A. M., Thursday, the boy was taken from the hospital and put on the train on which Dr. Hoffman arrived. At Cumberland the leg was taken off at the hip and the boy's life barely saved. Dr. Maxwell says it could have been safely taken off below the knee, if the operation had been performed promptly Wednesday afternoon.

As to some of this history, there is a good deal of conflict in the evidence. The aunt says she was at the hospital on Wednesday from 9 A. M. until 12, when she was sent out of the sick room by Dr. Maxwell, who, as well as the day nurse, told her, some time that morning, the boy was doing well. She says Dr. Maxwell saw her in front of his office at 3 P. M. and told her the case looked favorable. The mother says she went to the hospital Wednesday between 2 and 3 o'clock, and remained there until between 5 and 6 o'clock, spending the greater part of the time in the boy's room, and that the nurse told her, just before she left, the boy was getting along fine. When she reached her mother's house, on her way home, her mother informed her that Dr. Maxwell had been there and told her the boy's leg would have to be taken off. The grandmother says she was at the hospital Wednesday from 1 until 7:30 P. M., and that Dr. Maxwell came in about 4 o'clock, and again about 7 o'clock, and then told her the boy's leg would have to come off at the hip, and she requested him to wait until she got the boy's father,

grandfather and mother. On cross-examination, she says she objected to amputation by Dr. Maxwell. The head nurse, testifying from a chart, says the grandmother was in the room at 10:30 A. M. and from 2:30 until 5:30 P. M. on Wednesday. She swears, however, that Dr. Maxwell informed the grandmother of the serious condition of the boy at 2:30 of that day.

The plaintiff's case proceeds largely upon the hypothesis of improper treatment by Dr. Hoffman in the first instance, it being contended that the use of the plaster-paris cast in such a case is unskillful and unprofessional, on account of the probability of swelling and consequent constriction interfering with or cutting off circulation of the blood at the extremity. Gangrene results from such constriction, if continued long enough. One theory of the defense, founded largely upon the testimony of Dr. Maxwell, is that gangrene was occasioned by infection, gas bacillus in the wound, which noticeably developed on Wednesday morning, but the true character of which was not discernable until later in the day. The proof by expert testimony that the use of the plaster-paris cast, in the reduction of a compound comminuted fracture, is permissible, approved and widely adopted by the profession, is overwhelming. Neither Dr. Bell nor Dr. Gerstell, testifying as witnesses called by the plaintiff, condemned it as being violative of approved modern practice. In answer to a question, the former said: "That, of course, depends somewhat upon the man doing the work. Some prefer using one method and some another. It would not be bad practice, but good practice, to use bandages of that kind in order to prevent the parts from moving as much as possible." He further said he had himself used the cast in reduction of such fractures. Though he said he had never used one in a case like the one involved here, it was not shown that he had ever treated one exactly like it, and he did not disapprove the treatment adopted by Dr. Hoffman in the case in question. Dr. Gerstell retired from the practice of surgery a good many years ago and said he did not know what the modern method of treatment was. On this point he said: "I do not know what the ordinary practice in Mineral County is at the present time." He had previously made the same statement in slightly different words. He was permitted, however, to say that, if the bones were com-

minuted or the soft parts much involved or lacerated, the use of the cast would be, in his judgment, very bad surgery. This testimony went in over an objection and an exception. Both say the use of the cast in such cases necessitates more careful attention, and that the probability of swelling creates some danger of constriction interfering with circulation. Notwithstanding the practice twenty-five years ago, there is no conflict in the evidence as to the propriety of the use of the cast in such cases in modern surgery, and in the community in which the treatment in question took place. There is no proof that anything occurred before the departure of Dr. Hoffman indicative of an unfavorable change of condition. The leg was properly treated in the first instance and, in the absence of adverse symptoms or indications, approved surgery required nothing further, except watchfulness and attendance upon the patient, for a period of two or three days. Some of the experts say they do not redress such wounds for even longer periods than that.

The trial court certified that errors in the giving of instruction No. 2, at the instance of the plaintiff, was the ground on which the verdict was set aside. That instruction assumed the existence of evidence tending to prove the use of the plaster-paris cast was improper and had caused development of gangrene, by interruption of the circulation, and negligence on the part of the nurses and physician in charge of the patient after the surgical operation, resulting in development of gangrene. It submitted inquiries as to whether the cast caused interruption of the circulation; whether Dr. Hoffman exercised the usual and ordinary skill of physicians in the locality "in the treatment and setting of the fracture," and gangrene resulted from non-exercise thereof; and whether the nurses and physician in charge after the operation exercised the usual and ordinary skill of nurses and physicians in the locality "in taking care of the plaintiff after the operation," and gangrene resulted from non-exercise thereof.

Obviously, the first part of it is predicated solely upon the use of the plaster-paris cast. There is no evidence in the case to which it can be referred, except the testimony of Dr. Gerstell, unless it is competent for the jury to go beyond the inquiry as to what is usual and ordinary surgical skill in the locality, or

similar localities, and adopt their own ideas as to the propriety of the mode of treatment. That they cannot do. If a physician or surgeon, in a given case, adopts an established or approved method of treatment and is not negligent or careless in the application thereof, he is not liable, even for injuries caused by such treatment. *McKee* v. *Allen,* 94 Ill. App. 147; *Stern* v. *Lanng,* 106 La. 738; *Stevenson* v. *Gelsthorpe,* 10 Mont. 563; *Force* v. *Gregory,* 63 Conn. 167; 30 Cyc. 1575. If there are two or more approved methods of treatment, he may adopt and use the one which, in his honest judgment, will be the most efficacions. 21 R. C. L. p. 383. He is not bound at all hazards to adopt the best method. This is a principle well established in other branches of the law of negligence. *Wilson Bros.* v. *Bush,* 70 W. Va. 26. He is not liable for damages for an injury occasioned by an honest mistake of judgment in any case, if he possesses the skill he represents himself to have. *Die* v. *Corbin,* 59 W. Va. 266; *Staloch* v. *Holm,* 100 Minn. 276.

Even though the method in use when Dr. Gerstell practiced may still be in vogue in some places, and, in the opinion of some surgeons, may be the best method of treatment in cases of compound fracture, the method adopted by Dr. Hoffman was widely recognized and generally approved by the medical profession. That fact justified his use of it, even though a different one might have been more efficacious, and absolves him from both the charge of lack of skill and the charge of negligence in the use of the plaster-paris cast. Hence, in so far as the instruction propounded the inquiry whether the use of that method was unskillful practice or negligence, it had no foundation whatever in the evidence, and the error in giving it constituted good ground for setting aside the verdict.

Nor is there any evidence of lack of competency on the part of the nurses or Dr. Maxwell. The duties and responsibilities of the day nurse were comparatively light. The night nurse had had eighteen months experience and no witness attempted to say that was insufficient to qualify her. The head nurse's competency was not questioned by anybody. There is not the slightest evidence that Dr. Maxwell was incompetent to discharge the duties for which he was retained. Nor is there any evidence of negligence on the part of any of the nurses. Not

being physicians in charge of the patient, they had no authority to depart from the instructions given them by their employers. There is no proof that they did not obey their instructions or perform the duties assigned them, nor that they were not properly instructed. Their failure to give correct information to members of the family, if any, or to remain at all times in the sick room, is not evidence of negligence contributing to or occasioning the result complained of. Hence, as to them, the instruction rests upon a false assumption.

For another reason, which the court did not assign, the verdict may have been impeachable, namely, the admission of the evidence of Dr. Gerstell as to the method of treatment a quarter of a century prior to the date of the action complained of here. "In determining the degree of care and skill the law exacts of physicians and surgeons, regard must be had to the state of advancement of the profession at the time of the treatment. They are held to exercise the ordinary care and skill of their profession in the light of modern learning and enlightenment on the subject. Their treatment is measured by the standard existing at the time they practice, and not that which may have existed at some time in the past." 29 R. C. L. p. 384. See also *Dye* v. *Corbin,* 59 W. Va. 266, and *Lawson* v. *Conaway,* 37 W. Va. 159. Error in the admission of this evidence may have been cured by instructions given for the defendants, which told the jury the skill required was such as complied with the standard prevailing in the community at the time of the treatment. However, it should not be admitted in another trial, for it is clearly inadmissible.

To sustain the action of the court in granting a new trial, insufficiency of the evidence to sustain the verdict is invoked. On the same ground, it is insisted, by way of cross-assignment of error, that the court should have given a peremptory instruction asked for by the defendants and refused. As the order complained of is sustained upon another ground, it is unnecessary to enter upon an inquiry as to the sufficiency of the evidence, in passing upon the propriety of that order. Although an appellate court may, and sometimes does, pass upon the sufficiency of the evidence, for the purposes of a new trial, when it is unnecessary to do so in order to reach a conclusion as to

the correctness of the judgment under review, the general practice is to withhold any opinion the court may entertain respecting it. *Ward* v. *Brown,* 53 W. Va. 227, 274; *Osborne & Co.* v. *Francis,* 38 W. Va. 312, 325; *Neill* v. *Produce Co.,* 38 W. Va. 228, 236; *State* v. *Dickey,* 46 W. Va. 319, 324; *State* v. *Kerns,* 47 W. Va. 266. In another trial, the evidence may be different and, if the case shall be submitted under proper instructions, the jury may find for the defendants, on the evidence as it is now.

For the reasons stated, the judgment complained of will be affirmed.

*Affirmed.*