NORMAN TORRES PÉREZ, Plaintiff and Appellant, v. HOSPITAL DR. SUSONI, INC., ET AL., Defendants and Appellees.

No. R-64-58.　　Decided March 27, 1968.

*Rodríguez Ema & Rodríguez Ramón, Rodolfo Zequeira,* and *Nicolás Jiménez* for appellant. *Rivera Zayas, Rivera Cestero & Rúa, Herminio Miranda, Francisco Agrait,* and *Rodolfo Cruz Contreras* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The trial court did not commit error in dismissing appellant's complaint against appellees alleging the loss of a leg due to appellees' negligence in giving him inadequate medical assistance, it having been established (1) that the treatment given to appellant was the indicated and correct one; (2) that there was no evidence that the gas gangrene which developed in appellant's leg, which had been injured in an automobile accident, was due to the treatment or hygienic conditions of the hospital; (3) that its amputation was necessary in order to save his life; and (4) that his sister, who appeared to be in charge of the case, gave her consent to perform the amputation of the leg because in the surgeon's opinion, to inform the patient of the need for the amputation would depress him, considering his emotional state, and further, because under the circumstances of the case it was inhuman to thus obtain such consent. The damages claimed were not caused to appellant. We shall explain immediately.

The facts of the case, as determined by the trial court were the following:

"1. On November 11, 1959, at about 6:00 p.m., plaintiff was driving a motor vehicle on the highway from Manatí to Vega Baja, which was wet, and plaintiff lost control of the vehicle and went off the highway, colliding against a tree, suffering several injuries. He was placed in another automobile by some

persons who arrived at the place and taken to the Hospital of Manatí. Nothing was done to him in that hospital and he was taken in an ambulance to Hospital Dr. Susoni, Inc., of Arecibo, where he arrived at about 8:00 or 8:30 p.m. and was taken immediately to the emergency room of said hospital. X-ray pictures were taken which revealed a dislocation in the right knee. Plaintiff had an open wound from 5 to 6 inches long and over one inch deep in the popliteal region, behind his right knee, with dirt particles and blood clots. Dr. Miranda washed the wound to remove the dirt particles and dust with Phisohex and normal saline solution, disinfectants, and then proceeded to ligate the blood vessels and to remove all the fatty tissue in order to eliminate the sources of a possible infection. Then she sutured the wound and reduced the dislocation in the usual manner, placing then a circular plaster cast on his right leg, waiting for it to set, and then cut it in the front from the upper part of the thigh to where the toes begin. In the operation room a first dose of antigangrenous TAT was also applied to avoid tetanus and gas gangrene with instructions to repeat it in the morning. Moreover he was given a penicillin shot to avoid or attack any possible infection, and a liquid serum to maintain the normal blood volume. Orders were given to administer demerol to him, which was subsequently administered to relieve pain. During the proximate days all the instructions and orders of Dr. Miranda were followed and the patient was visited at least twice daily by different physicians of the defendant hospital, including Drs. del Toro, Susoni, and Rodríguez Olmo.

"2. Plaintiff developed in his right leg an infectious gas gangrene which is produced by the entrance of bacteria in a wound exposed to dust or dirt, and, according to the evidence as a whole, including the testimony of the sole expert presented by plaintiff, it is inferred that plaintiff contracted it, in all probability, at the place of the accident or during the time he was taken to different places before being treated by Dr. Miranda. As a result of the gangrene it was necessary for Dr. Susoni to amputate plaintiff's right leg on November 14, 1959, in order to save his life, since otherwise the infection would continue to extend to the rest of the body and would have caused his death.

"3. The treatment administered to plaintiff by Hospital Dr. Susoni, Inc., and by the defendant doctors was the one indicated

for an injury of the nature of that suffered by plaintiff and the procedures and techniques of the medical science were used according to the best practice of modern medicine. It was established that medical science does not know of other means or procedures different from those used by the defendants in the treatment of plaintiff's injury and which might avoid the occurrence. Also, plaintiff did not establish that his damages were caused by the lack of skill or expertness in the treatment administered by defendants and on the contrary it was established by defendants' evidence that all the defendant doctors acted with the greatest skill, expertness and zeal which can reasonably and prudently be exercised.

"4. Plaintiff did not introduce any evidence tending to establish that the gas gangrene was caused by a negligent act or omission of defendants. Plaintiff introduced evidence that he felt the cast was too tight and that he complained. However, it was established, even by the testimony of plaintiff's own expert, Dr. Lugo, that the gangrene due to tightness is manifested in a different manner from the gas gangrene and that it is easy to distinguish one from the other, it being affirmed by Dr. Lugo and all the other defendant's doctors that definitively the gangrene which attacked plaintiff was gas or infectious gangrene and not caused by tightness. It was also established by the testimony given by all the experts, including Dr. Lugo, that a gas gangrene may cause in the patient a sensation of tightness even without having a plaster cast nor anything constricting the affected organ of the body.

"On the other hand, plaintiff's evidence was extremely inconsistent. The witnesses testified in a hesitant and insecure manner and because of the manner they testified and the contradictions they incurred the court has serious doubts as to the credibility of their testimonies."

On the basis of these facts, said court dismissed the complaint.

Appellant assigns that the trial court committed error:

"1. . . . in concluding that . . . because of the development of gangrene it was necessary for Dr. Susoni to amputate the right leg on November 14, 1959.

". . . . . .

. "2. . . . in omitting in its Findings of Fact that codefendant Hospital Dr. Susoni, Inc., did not obtain plaintiff's consent to perform the amputation of his right leg.

. "3. . . . in dismissing the complaint filed in this case, departing from the doctrine established in Puerto Rico, by the decisions of that Court in the cases of *Rojas* v. *Maldonado*, 64 [*sic*] P.R.R. 757, and *Montes* v. *State Insurance Fund*, opinion of January 31, 1963. [87 P.R.R. 187.]

: "4. . . . in weighing as a whole the evidence introduced during the hearing of this case."

1. Appellant contends that the amputation of his leg was performed on November 16 and not the 14th as the trial court concluded. We do not see how this clerical error could prejudice appellant, error which could be cured at the request of appellant himself. *Sierra* v. *Nido*, 71 P.R.R. 847, 852 (1950).

2. It is true that the trial court did not make any finding on whether or not appellant's consent was obtained to perform the amputation of his right leg. This assignment lacks substantiality for not only did appellant fail to request timely that the trial judge include said circumstance in his findings of fact but even if he had included it, it would not call for a different judgment from that rendered by the judge in this case. Further on we indicate why.

3. With respect to the consent required to perform the operation in question, according to our decision in *Rojas* v. *Maldonado*, 68 P.R.R. 757 (1948), appellant's sister, who from the time he arrived at Hospital Susoni, was at his side, attentive and diligent as to his comfort, when she was asked what did Dr. Susoni tell her (on November 16, 1959 when the amputation of appellant's leg was performed), she testified that:

"I was at my brother's side and then he [Dr. Susoni] took me outside and made me stand there in front of his room and told me that since I was in charge he was going to break the news to me, *and that it was necessary to amputate my brother's*

*leg.* Then, when he told me that, I said: 'oh, no doctor, it cannot be.' Then I lost . . . . He answered me: 'But do not cry.' Because I was crying. *And then he told me that if the leg was not amputated he would die. That if I did not give my consent, he would die, because he had gangrene. Then I told him that he was the doctor and knew what he should do."* (Italics ours.)

Dr. Susoni's examination on this question was as follows:

"Q. Did you ask Norman Torres for his authorization in writing to amputate his leg?
"A. We always ask the relatives.
"Q. Norman Torres?
"A. I do not remember. It is an order in force, which is always done, and the consent must be there in the record.
"Q. Signed by him?
"A. I do not know whether by him or by his relatives.
"Q. Did you know his age?
"A. Twenty-six years old.
"Q. He did not authorize you?
"A. In these cases, generally, the necessary surgery is performed. *If I tell a patient:* 'I am going to amputate your leg,' there is no question that, considering his emotional state I am going to depress him."

"Q. How seriously ill must a patient be for you to ask his consent, to tell him: 'I am going to amputate your leg'?
"A. It is an inhuman practice."

"Q. Can you tell me the reason for amputating Norman Torres Pérez' leg?
"A. *Because he developed a gas gangrene and his general condition deteriorated and could put his life at stake. Certainly his life would have been at stake if the leg was not amputated.*
"Q. If Norman Torres' leg had not been amputated, what would have happened?
"A. *Probably the patient would have died."* (Italics ours.)

When he was asked why was appellant's leg amputated, Dr. Aníbal Lugo, appellant's witness, answered that: "His

condition was not controlled with the means used and it was a situation where his life was endangered." He added that: "I believe that everything which could be done to control it was done to him. Drainage, antibiotics, antigangrenous serum. The situation was such, it seems that the situation was so massive, that it continued progressing. *Some persons have died for failure to perform a timely amputation on them.*" (Italics ours.)

Dr. Rodríguez Olmo testified that it was necessary to amputate "because the infection would have spread and he would have died as a consequence thereof," it was a matter of saving his life.

In *Montes, supra,* we said that on certain occasions, as in emergency cases, the consent of the patient is not necessary to perform the operation. "An emergency is an unforeseen combination of circumstances which calls for immediate action; a necessity is that which is unavoidable, inevitable or indispensable. When an emergency occurs there is an immediate necessity to cope with it." *Wheeler* v. *Barker,* 208 P.2d 68 (Cal. 1949). In *Wheeler, supra,* it was also said that ". . . when a surgeon is confronted with an emergency or an unanticipated condition and immediate action is necessary for the preservation of the life or health of the patient and it is impracticable to obtain consent to an operation which he deems to be immediately necessary, it is his duty to do what the occasion demands within the usual and customary practice among physicians and surgeons in the same or similar localities and he is justified in extending the operation and in removing and overcoming the condition without the express consent of the patient." Both, *Jackovach* v. *Yocom,* 237 N.W. 444 (Iowa 1931) and *Browning* v. *Hoffman,* 103 S.E. 484 (W. Va. 1920), deal with the necessary amputation of an arm in the first, and a leg in the second. In both cases the patients were boys and in both, effort was made to obtain the consent of the parents but they were not

available. It was decided that under such circumstances the consent was implied, and an emergency operation could be performed without waiting for the consent. See attorney Robert E. Powell's article *"Consent to Operative Procedures,"* 21 Md. L. Rev. 189 (1961). See, also, *Shelter* v. *Rochelle,* 409 P.2d 74 (Ariz. 1965); *Natanson* v. *Kline,* 350 P.2d 1093 and 354 P.2d 670 (Kan. 1960); *Bang* v. *Miller,* 88 N.W.2d 186 (Minn. 1958).

In the case before us, the patient was an adult and was in his sound mind when Dr. Susoni requested the consent of his sister to perform the aforesaid amputation. As it was said in *Woods* v. *Brunlop,* 377 P.2d 520 (N.M. 1962) "another exception is where an explanation of every risk attendant upon a treatment procedure may well result in alarming a patient who is already apprehensive and who may, as a result, refuse to undertake surgery or a treatment in which there is a minimal risk or where such disclosure may result in actually increasing the risk by reason of the psychological results of the apprehension itself." See *Hunt* v. *Bradshaw,* 88 S.E.2d 762 (N.C. 1955).

Considering all attendant circumstances, and particularly the danger to which the patient was exposed, the error concerning consent to perform the amputation was not committed.

4. It is assigned that the trial judge committed error in weighing the evidence. Appellant sought to establish that the gas gangrene which required the amputation of his leg was caused by the fact that when the leg was put in the plaster cast, it was extremely tight, to the extreme that circulation was obstructed. It was also sought to establish that appellant must have contracted the infection in the hospital itself and that the treatment given by Dr. Miranda was inadequate. The evidence on these particulars was the following:

(a) Both appellant and his sister testified that the trousers he was wearing when the accident occurred were new, they were not soiled or torn; they were only stained with blood.

(b) However, Dr. Miranda, who was the first to treat appellant, testified that in the wound of the leg there was dirt and that she removed it with a saline and Phisohex solution.

(c) With respect to the conditions of the hospital Drs. Rodríguez Olmo and Susoni testified thus:

"Q. During those days that Norman Torres Pérez was hospitalized in Clínica Susoni, I ask, what were the sanitary conditions of the hospital?

"Dr. Rodríguez Olmo:

"Our operation room goes through all the sterilization procedure required in all hospitals. We are so exacting that, periodically, we call the Department of Health so they come to make the cultures. Cultures are made of the floors, tables, of everything in the room. All due precautions are taken.

"Q. To prevent infections?

"A. Yes, sir. And when there is intervention in a case like this, next day the ceiling and walls are washed.

"Q. In your opinion as a physician and after making an analysis of everything you have observed, how did you find [sic] the infection?

"MR. SEQUEIRA:

"It is an opinion that is being asked concerning the manner it is contracted.

"A. May I answer?

"JUDGE POLO:

"Q. Yes.

"A. That it was contracted at the time the wound was produced.

"Q. I ask you what rules does Clínica Susoni adopt with respect to the sanitary conditions of the premises themselves, the room, operation room, etc.?

"DR. SUSONI:

"In the rooms, when a patient leaves, the normal hygiene is done. If it is an infectious case, fumigation and what the Department of Health requires is done, and in the operation room asepsis is continuously made, and that is performed by the Department of Health at our request.

"Q. And this was done while Norman Torres Pérez was hospitalized there?

"A. It has been done always."

(d) The evidence of the condition in which the plaster cast was put was conflicting: Dr. Miranda testified that after the cast was set on the leg she cut it from top to bottom, entirely; that the patient was administered "antitetanic and antigangrenous TAT as well as penicillin and serum." Dr. Julio Rodríguez Olmo testified that in his capacity as supervisor he verified that all the previous treatment had been administered to the patient by the aforesaid doctor. The patient's record shows that the plaster cast was bivalved. Appellant as well as the witness Félix Manuel Freytes, a friend who visited appellant, testified that the cast was solid, without openings and that it was Dr. Ramón del Toro who cut the cast on Friday afternoon with a saw and then, helped by the witness, introduced a stick in the opening so it remained opened. Appellant complained continuously that the cast constricted his leg excessively and continuously.

The physicians testified that when gangrene is produced a sensation of tightness is felt in the affected area even when it is not covered with a plaster cast. The physicians also testified that the dry gangrene (another type of gangrene different from the gas gangrene) may be produced by compression; that the gas gangrene is produced "by the entrance of bacteria in a wound"; that "every wound when produced is contaminated"; that "a wound of that nature [that suffered by appellant] could be contaminated with bacteria which could produce a gas gangrene"; that if gan-

grene due to tightness had been produced "the gas crepitus" would not have been heard in the leg; that gas gangrene cannot be produced by a tight cast; ". . . if there is no bacteria, it cannot be produced"; that in order to prevent it, it is convenient that the cast is not tight since the lack of circulation resulting from the tightness "can predispose and help in the creation of bacteria."

. Dr. Rodríguez Olmo testified that the tight cast, by itself does not produce gas gangrene, "but if there is a bacterial infection and compression, that compression is to be favorable in the production of gas gangrene, but not to produce it by itself."

Appellant's own witness, Dr. Aníbal Lugo, testified that to cut the cast after it is set (as Dr. Miranda testified she did in appellant's case) is a good practice, but that he does not do it in his cases because "the entire circular cast gives more stability"; that gas gangrene "commences at the time of traumatism . . . the organism which causes this is notable, because it prevails at any place . . . when the cast is tight and the leg is swollen it would produce the state of lack of nutrition and of anaerobism which is needed for the development of an infection, but, in the presence of an open wound"; that it is typical in a case as that of appellant to feel a sensation of tightness in addition to pain; that "gas gangrene cannot be produced by compression only, but that there must exist the infectious bacteria inside the organism"; that everything possible to control the situation was done to appellant.

(e) Appellant introduced evidence that the compound dislocation of the knee with an incisive wound in the popliteal region is a serious injury, relatively infrequent. Dr. Lugo testified that a surgeon is better equipped than a physician to treat it but that when there are no other facilities to treat a case like that, the physician must act; that even having the experience "It is always good to delegate re-

sponsibility on another . . . and even having the experience, it is good to be aided by another."

Dr. Miranda testified that "she had sufficient experience in surgery"; that she had put on plaster casts many times; that she had treated appellant's type of dislocation several times; that "the X-ray picture shows that the dislocation had reduced well" (in appellant's case); that although she did not take the pulse after the reduction she verified the circulation of the distal section of the leg and it was not cold nor cyanotic; the legs were warm and of a normal color; that the lack of circulation may produce dry gangrene.

The evidence showed that Dr. Rodríguez Olmo, Dr. Miranda's supervisor, arrived at the operation room where appellant was, before the leg was put in the plaster cast. He testified that next day he saw him again; he found him in a satisfactory state; the color of his fingers and the temperature were completely normal, that he saw him every day, and that neither the patient nor any other person complained that the cast was tight; the patient's injury was treated in the correct manner "because I saw part of the treatment," that "I know I was there until it was reduced, when I saw that it was reduced and its anatomical configuration was perfect"; that adequate procedures were followed, "moreover it is the routine of the hospital."

In the light of the foregoing summary of the evidence we conclude that the trial judge did not commit error in concluding, as a matter of fact, that appellant did not establish that the gas gangrene was caused by a negligent act or omission of appellees.

In view of the foregoing the judgment of the Superior Court, San Juan Part, of January 28, 1964, will be affirmed.