[No. D006876. Fourth Dist., Div. One. Mar. 15, 1990.]

LINDA HINSON, Plaintiff and Appellant, v.
CLAIREMONT COMMUNITY HOSPITAL et al., Defendants and
Respondents.

1114

**COUNSEL**

Thompson & McIntyre, Lowell, Robbin & McIntyre, Lowell, Robbin, Hamilton & McIntyre, Monty A. McIntyre, Lann G. McIntyre and Mitchel J. Olson for Plaintiff and Appellant.

Jennings, Engstrand & Henrikson, Douglas R. Reynolds, James J. Wallace II, Hollywood & Neil and Robert W. Frank for Defendants and Respondents.

## OPINION

**KREMER, P. J.**—Linda Hinson appeals an adverse judgment on her complaint against Dr. Harrison Robbins and Clairemont Community Hospital for medical malpractice.[1] On appeal, she contends the court erred in excluding evidence relevant to Robbins's skill and training; in applying Evidence Code section 1157 to deny her discovery requests; in bifurcating the issues of the hospital's corporate liability from the doctor's malpractice; and in applying Civil Code section 1431.2 relating to the allocation of noneconomic damages. Hinson also contends the jury's verdict is not supported by substantial evidence. We conclude reversible error did not occur and therefore affirm.

### FACTS

On August 12, 1981, at Clairemont Community Hospital, Robbins operated on Hinson's nose and inserted an implant into her chin. The operations were to correct breathing problems and to improve Hinson's appearance. There were no apparent complications during the surgery. After the operations, Hinson's nose was asymmetrical, pulled up and very narrow and the chin implant was off-center, on the right side of her chin.

On December 7, in his office, Robbins removed the chin implant, trimmed a portion of the right side of the implant and replaced it.

On February 12, 1982, Robbins performed additional surgery on Hinson's nose and chin at Clairemont Hospital. The surgery on Hinson's nose was similar to that originally performed. The problems with Hinson's nose persisted and the chin implant sat very low on her chin. Robbins eventually removed the implant in late March 1982 in his office. Following the removal of the chin implant, Hinson developed an infection.

Robbins "felt badly for her and badly for the result of the surgery." He referred her to Dr. Aronsohn for consultation and additional surgery to

---

[1] While this appeal was pending Hinson entered a settlement with Clairemont Hospital and the appeal against Clairemont has thus been dismissed. In the course of the opinion, we refer to arguments raised by Clairemont because they are germane to the issues presented.

correct the problems with her nose and chin. She saw Aronsohn three times during March and July 1982.

During this period, Hinson also consulted with Dr. Carson Lewis, Dr. Merell Oelsen, Dr. Frank Pavel, Dr. John Alexander and Dr. Gary Lee Nobel. She eventually elected to have Dr. Alexander perform additional surgery.

Alexander performed three surgeries on Hinson. In June 1983, Alexander intended only to release some of the scar tissue in her chin which was "causing a good bit of deformity" but during the operation decided to insert a new implant. In September 1983, Alexander operated on her nose. He noted a lack of "that cartilaginous septum at the membranous septal level," used cartilage from Hinson's ear to build up the bridge and released scar tissue which allowed the tip to drop down "a significant amount." In May 1984, Alexander operated on both her chin and nose. He placed an L-shaped implant in her nose and thinned out scar tissue in the chin. Following these surgeries, the appearance of Hinson's nose and chin were improved but not perfect.

Hinson had further surgeries performed by Dr. Dennis Nigro and by Dr. Shean between September 1983 and June 1986. During these surgeries, the implants in Hinson's nose and chin were removed, a bone graft was placed in her nose and the bones in her chin were cut and slid forward.[2] At the time of trial, Hinson was contemplating additional surgery with Dr. Nigro.

## DISCUSSION

### I

### *Exclusion of Evidence*

Hinson contends the court erroneously excluded evidence relating to Robbins's training and practice.

Hinson complains the following evidence was erroneously excluded: (1) Robbins's termination from the residency program at Stanford University after two years because of his inadequate performance; (2) Robbins's termination from the Indiana University residency program because he was trying to perform surgery he was not qualified or competent to perform, he

---

[2] Nigro also performed a blepharoplasty on Hinson, i.e, "a procedure done to increase the tone, excise excess skin and remove fat pads from either the upper or lower or both lids of the eye."

was believed to be dishonest by the physician who headed the Indiana residency program (Dr. Brown) and because he refused to repeat his third year; (3) Robbins's termination from employment by the Kaiser Permanente Medical Group in San Diego after one day because Robbins had been dishonest in failing to include all of the residency programs he had attended on his application and because Kaiser had received negative comments on Robbins's performance from the department heads at the residency programs at Stanford, Indiana and Connecticut Universities, and the Kaiser facilities in northern California where Robbins previously had been employed; and (4) Robbins's suspension of staff privileges at Sharp Memorial Hospital because Robbins was performing unnecessary surgeries (including the same type of surgery involved here) and was endangering the lives of patients.

Hinson argued the evidence was relevant "to the issue of whether [Robbins had] the degree of learning and skill ordinarily possessed by reputable physicians." She argued Robbins's training and education were relevant "under BAJI [6.00] because the degree of learning and skill ordinarily possessed by reputable physicians is one standard that the jury uses in order to determine the negligence issue." Hinson also argued the evidence was relevant to Robbins's veracity. The defendants moved to exclude the evidence before Hinson called Robbins as her first witness and sought to examine him as an adverse witness pursuant to Evidence Code section 776.[3]

The trial court ruled Hinson could ask Robbins whether he had completed the residency programs at Stanford and Indiana Universities but not the reasons he failed to complete the programs. The court based its ruling on Evidence Code sections 352[4] and 1101, subdivision (a).[5] The court permitted Hinson to ask Robbins if he was terminated from Kaiser's employment after only one day. When the court asked if Hinson wanted to ask anything else, she responded: "I think that's all I would ask him on that." As to the suspension of Robbins's privileges at Sharp Hospital, the trial court ruled the evidence was inadmissible pursuant to Evidence Code sec-

---

[3] Evidence Code section 776, in pertinent part, provides: "(a) A party to the record of any civil action . . . may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness."

[4] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[5] Evidence Code section 1101, subdivision (a), in pertinent part, provides: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

tions 352, 1101, subdivision (a) and 1104[6] and noted potential hearsay problems. While making its ruling, the court pointed out more than once that it was ruling on the admissibility of the evidence during the examination of Robbins under Evidence Code section 776.[7]

## A. *Standard of Care*

 Hinson first contends the exclusion was erroneous because the evidence was relevant to the standard of care in medical malpractice actions. She argues: "The standard of care has two components. The first component addresses whether the doctor *has* the degree of learning and skill ordinarily possessed by similarly reputable physicians. The second component concerns whether the doctor *used* the care and skill ordinarily possessed by similar reputable physicians. (Italics by Hinson.)

Robbins and Clairemont point out "[t]he most frequent basis for malpractice suits is not whether the physician had a requisite amount of skill and knowledge, but rather as to whether s/he was negligent in the diagnosis or treatment." They argue "[t]he determination of whether a professional duty has been breached is based on the *actions* of other professionals of ordinary skill when faced with *performance of similar tasks.* [Citation.]" (Italics in original.) They see Hinson's argument as posing the following question: "If a plaintiff fails to prove at trial that the doctor did not *use* the requisite degree of skill, can she then go on to prove, or be granted a new trial to prove, that the doctor did not *possess* the requisite degree of skill?" (Italics added.)

---

[6] Evidence Code section 1104, in pertinent part, provides: "[E]vidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion."

[7] During oral argument, we questioned the scope of the court's ruling, pointing out that the court, for example, in discussing the admissibility of the Stanford residency program evidence, had stated: "Remember we're talking now only about what you can ask Dr. Robbins when you take him under 776. I'm not in any way trying to pass at this time on what questions you're going to ask other doctors or other persons about the performance of Dr. Robbins, and I'm in no way trying to tell you what you can do by way of impeachment." Hinson asserted that the scope of the court's ruling was very broad and entirely precluded any introduction of the evidence. She represented that in untranscribed chambers conferences the court made it clear its exclusionary ruling was not limited to the Evidence Code section 776 examination of Dr. Robbins. We vacated submission of the case, granted Hinson's motion to augment the record to include two untranscribed conferences and allowed the parties to submit further briefing on the issue of the scope of the trial court's ruling.

Neither of these previously untranscribed conferences support Hinson's assertion the trial court excluded all of the evidence for all purposes.

These augmentations to the record do not contain broad evidentiary rulings by the trial court which contradict statements it made limiting the scope of its rulings. Further, as we subsequently discuss, the basis for our holding the evidence was properly excluded rests on our conclusion it was not relevant to an alleged training, education and experience "component" of the standard of care and was, in essence, improper evidence of character.

These arguments are somewhat at cross-purposes. Hinson's argument is directed to the duty of a physician to possess a certain level of learning and skill, i.e., to the level of training, knowledge and skill the law requires of physicians, while Robbins's argument is directed to the elements necessary to prove medical malpractice, i.e., what must a plaintiff establish in order to recover for medical malpractice. ■ Hinson is correct in that it is clear the law imposes on individuals a duty to have medical education, training and skill before practicing medicine and that practicing medicine without this education, training and skill is negligent.[8] Robbins is also correct in his assertion that a breach of that portion of the standard of care does not, in and of itself, establish actionable malpractice (i.e., one cannot recover from a person merely for lacking medical knowledge unless that lack of medical knowledge caused injury to the plaintiff).

The standard of care, as reflected in BAJI No. 6.00[9] and Supreme Court cases is framed in terms of the "reasonable degree of knowledge and skill which is ordinarily *possessed* and *exercised* by other members of his profession in similar circumstances." (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 408 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324], italics added; see also *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) The Restatement Second of Torts section 299A, comment e, explains that portion of the standard pertaining to possessing the requisite skill and knowledge as follows: "In the absence of any such special representation, the standard of skill and knowledge required of the actor who practices a profession or trade is that which is commonly possessed by members of that profession or trade in good standing. It is not that of the most highly skilled, nor is it that of the average member of the profession or trade, since those who have less than median or average skill

---

[8]See, e.g., *Myers* v. *St. Francis Hospital* (1966) 91 N.J.Super. 377 [220 A.2d 693, 15 A.L.R.3d 1432], where a New Jersey court stated in the context of deciding what is "relevant to the subject matter" in a discovery dispute: "A doctor's training, experience and medical competency in treating conditions similar to those for which he treated the infant plaintiff have a 'tendency in reason to prove' that he may not have had the qualifications or experience to perform the blood exchange transfusion. In every malpractice action defendant's possession of the required knowledge and skill ordinarily possessed and exercised in similar situations by the member of the profession practicing in his field is clearly in issue under substantive law and the pleading. [Citations.]" (*Id.* at p. 698.)

[9]BAJI 6.00, which is entitled "Duty of Physician," states: "In performing professional services for a patient, a physician has the duty to have that degree of learning and skill ordinarily possessed by reputable physicians, practicing in the same or a similar locality and under similar circumstances.

"The further duty of the physician is to use the care and skill ordinarily exercised in like cases by reputable members of the profession practicing in the same or a similar locality under similar circumstances, and to use reasonable diligence and his or her best judgment in the exercise of skill and the application of learning, in an effort to accomplish the purpose for which the physician is employed.

"A failure to fulfill any such duty is negligence."

may still be competent and qualified. Half of the physicians of America do not automatically become negligent in practicing medicine at all, merely because their skill is less than the professional average. On the other hand, the standard is not that of the charlatan, the quack, the unqualified or incompetent individual who has succeeded in entering the profession or trade. It is that common to those who are recognized in the profession or trade itself as qualified, and competent to engage in it." (*Id.* at § 299A, com. e, p. 74.)

 In other words, the possession of knowledge and skill portion of the standard of care references minimum or threshold qualifications that must be met. While these threshold elements may vary in a given case, generally they are evidenced by graduating from medical school, passing the medical boards and receiving certification to practice medicine.[10] Beyond showing that an individual failed to complete his or her medical training or was denied certification to practice medicine, details of one's medical education or training are not relevant to show a breach of the standard of care; such evidence is essentially character evidence tending to show one's character for skill, competence or negligence. Such character evidence has generally been held inadmissible.

Under the Evidence Code, evidence that a person is a competent or skilled physician (or the inverse), whether proven by reputation, opinion or specific acts, is not admissible to prove the defendant was negligent on a particular occasion. (Evid. Code, §§ 1101, subd. (a), 1104.) Evidence Code section 1101, subdivision (a) prohibits evidence of a person's character or trait (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) to prove conduct on a specified occasion. Evidence Code section 1104 makes it clear that "evidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion."

---

[10] See, e.g., *Smothers* v. *Hanks* (1872) 34 Iowa 286, 289, where the court held an instruction stating the standard was that of "thoroughly educated" surgeons was erroneous, explained: "In our opinion this instruction does not give the true legal standard as to the skill and diligence required. The error consists in requiring the measure of skill and diligence ordinarily exercised by *thoroughly educated* surgeons; whereas, the true measure is that ordinarily exercised in the profession by the members thereof as a body. That is, the average of the reasonable skill and diligence ordinarily exercised by the profession as a whole. Not that exercised by the *thoroughly educated;* nor yet that exercised by the *moderately educated,* nor merely of the *well educated,* but the *average* of the thorough, the well, and the moderate—all, in education, skill, diligence, etc. We do not stop to discuss critically the meaning of the term, 'thoroughly educated;' nor is it necessary to prove that it means 'fully, completely and perfectly educated,' or that it necessarily implies an entire and perfect knowledge. It is enough that it must mean that the standard of the skill and diligence was not the average of the whole body of the profession, or in other words, *ordinary skill,* but was that exercised by some defined or undefined portion of the profession, or in other words, *more than* mere *ordinary skill.*" (Italics in original.)

As the Illinois Supreme Court observed over a hundred years ago: "It does not . . . follow that because the defendant's skill, or rather the want of it, was put in issue, that it could be either established or disproved by showing his general reputation. While his skill, or the want of it, was put in issue, his reputation in that respect was not put in issue, and therefore evidence to establish it was properly excluded. Suppose it appeared from the evidence that the treatment of the plaintiff's leg was proper, and in every respect according to the most approved surgery, and evidence of the character offered had been admitted, would it have availed the plaintiff anything if it further appeared from the evidence that the defendant was generally reputed to be an unskillful and unsafe surgeon? Surely not. . . .

"There are many reasons . . . why evidence of this character is not admissible. *First*, its bearing upon the issue is too remote, and in many, if not in most, cases it would tend to mislead the jury, rather than enlighten them. The veriest quack in the country, by his peculiar methods, not infrequently becomes very famous for the time being in his own locality, so much so that every person in the neighborhood might safely testify to his good reputation. It is true that one's reputation, thus acquired, is generally of short duration. His patrons sooner or later must pay the penalty of their credulity by becoming the victims of his ignorance, and with that his good name vanishes. Yet, according to the principle contended for, the quack, in such case, when called to account for his professional ignorance, might successfully entrench himself behind his previous good reputation. Again, one may in many respects be a good practitioner, and deservedly stand well in the neighborhood in which he lives, and yet, at the same time, be grossly ignorant about some matters in the line of his profession which would render him liable if, by reason thereof, his patient should be improperly treated, and thereby subjected to loss or injury. In such case, it is manifest, evidence of the defendant's good reputation would be no answer to an action brought for the injury sustained, and its admission would be clearly calculated to mislead the jury." (*Holtman* v. *Hoy* (1886) 118 Ill. 534 [8 N.E. 832, 833].)

A South Carolina court similarly observed in a medical malpractice case: " 'Defendant's reputation as a physician was not in issue. It was his specific acts in the treatment of a certain case, and the facts as to whether his acts were unskillful and negligent in this treatment was the matter in issue. A doctor's reputation for skill and ability will not exonerate him, where gross negligence and want of the application of skill is alleged and proved. Nor can the fact that a doctor is reputed to be negligent or unskillful be allowed as proof to establish negligence or unskillful treatment in a particular case, because he may have treated that case with unusual skill and care.' " (*Green* v. *Shaw* (1926) 136 S.C. 56 [134 S.E. 226, 227, 48 A.L.R. 243], quoting

*Stevenson* v. *Gelsthorpe* (1891) 10 Mont. 563 [27 P. 404]; see also *DeLaughter* v. *Womack* (1964) 250 Miss. 190 [164 So.2d 762, 769], overruled on other grounds in *Hall* v. *Hilbun* (Miss. 1985) 466 So.2d 856, 869.)

The general reputation of the defendant's medical school has also been held inadmissible since "[w]hatever that reputation might be, the individual student might possess more or less skill than others. The proficiency that one makes in the pursuit of science must depend mainly upon personal exertion and talent, and cannot be measured with legal accuracy by the reputation of the institution at which his studies may be pursued." (*Leighton* v. *Sargent* (1855) 31 N.H. 119, 134.)

■ Case law also generally holds inadmissible evidence of the defendant's prior negligence in medical treatment to prove he was negligent in a particular case and holds inadmissible opinion evidence as to the defendant's general skill as a physician. (See, e.g., *Johnson* v. *Myers* (1968) 118 Ga.App. 773 [165 S.E.2d 739, 33 A.L.R.3d 1047]; *Leighton* v. *Sargent, supra*, 31 N.H. 119, 134.)

■ Here, the evidence Hinson sought to introduce of Robbins's performance in medical school and his terminations from Kaiser and Sharp was not relevant to showing Robbins lacked the requisite knowledge or skills ordinarily possessed by other physicians. Rather, the evidence, as offered, was only relevant to show that since Robbins had performed poorly in the past, an inference could be drawn that he was a poor physician in general and therefore performed poorly in Hinson's case. Essentially, the evidence showed Robbins had a character trait of being an unskilled, incompetent and negligent physician and surgeon. As discussed above, an individual's character as a competent or skilled physician (or the inverse), whether proven by reputation, opinion or specific acts, is not admissible to prove the defendant was negligent on a particular occasion. This evidence was properly excluded.

## B. *Expert Testimony on the Standard of Care*

■ Hinson asserts the court's exclusion of evidence was erroneous because it prevented her from presenting expert testimony on the standard of care. This assertion is not supported by the record. The court never prohibited Hinson from presenting expert testimony on the requisite degree of learning and skill which an otolaryngologist like Robbins should possess before undertaking to provide professional services.

## C. *Expert Qualifications and Impeachment*

Hinson contends the court should have admitted the evidence because it was relevant to Robbins's qualifications as an expert witness and was admissible for impeachment.

Initially, we note the trial court did not exclude all the evidence for impeachment purposes. The trial court did not exclude evidence relating to Indiana University or Kaiser.

In ruling on the admissibility of the evidence relating to Robbins's performance at the Indiana residency program, the court reminded Hinson it was ruling only on the admissibility of the evidence during Hinson's examination of Robbins pursuant to Evidence Code section 776. The court specifically stated it was not precluding use of the evidence relating to Robbins's alleged dishonesty (i.e., that the chief of the residency program believed Robbins was dishonest and a liar) from being used as impeachment.[11]

As to the evidence relating to Robbins's termination from Kaiser, the record shows when the court asked Hinson what inquiry she wanted to make, she stated she only wanted to establish that Robbins had been at Kaiser for one day. Hinson was permitted to make this inquiry.

The trial court initially excluded evidence relating to Stanford University only during Hinson's Evidence Code section 776 examination of Robbins.[12] Subsequently, the trial court broadened its ruling by excluding the evidence pursuant to Evidence Code section 352.

Under Evidence Code section 352, the trial court has discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission will result in an undue consumption of time or will create a substantial danger of undue prejudice, confusion of the issues or misleading of the jury.

"Reasonable exercise of trial court discretion pursuant to Evidence Code section 352 requires that the trial judge balance the probative value of the

---

[11] In response to Hinson's argument testimony by the head of the Indiana residency program that Robbins was a liar was relevant impeachment on Robbins's character for honesty and veracity, the trial court stated: "You can do it on impeachment, you can do it, but you're not trying to impeach. You're taking him on 776 and there has been no basis for you to use it. Later on maybe. So I'm not going to try to rule in advance on things I don't know about because I'm not going to be correct on all the rules if I tried to do that."

[12] The court stated: "Remember we're talking now only about what you can ask Dr. Robbins when you take him under 776. I'm not in any way trying to pass at this time on what questions you' re going to ask other doctors or other persons about the performance of Dr. Robbins, and I'm in no way trying to tell you what you can do by way of impeachment."

offered evidence against its potential of prejudice, undue consumption of time, and confusion. [Citation.] That balancing process requires consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion. [Citation.] The more substantial the probative value of the evidence, the greater the danger of the presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence. [Citation.]" (*Kessler* v. *Gray* (1978) 77 Cal.App.3d 284, 291 [143 Cal.Rptr. 496].)

Hinson argued the evidence was relevant to counter Robbins's evidence "paint[ing] himself . . . as a very finely qualified and competent doctor." She explained she wanted to ask Robbins if he had been terminated from Stanford University's residency program because he had not performed in a manner that was acceptable for Stanford University residents. She stated that if Robbins denied having been terminated for inadequate performance she would impeach him with testimony by Dr. Blair Simmons, the chairman of the otolaryngology department. Hinson represented Dr. Simmons would testify he specifically recalled Robbins had been terminated for tardiness and believed Robbins must also have been performing below Stanford's standards since Stanford did not terminate students solely for tardiness.

The respondents pointed out Dr. Simmons had also stated in his deposition that while Robbins had needed further training in otolaryngology he had been a competent general surgeon. Dr. Simmons had also admitted some individuals who leave Stanford go on to become great doctors. The respondents explained Robbins's year of general surgery had been supervised by someone other than Dr. Simmons, and that this other physician had a different opinion as to Robbins's competence. Finally, Robbins, after conceding there was some paperwork from Stanford indicating Robbins's performance had been below average, argued: "[Y]ou've got to put that in context; that's below average for a Stanford resident. And if we get into that then we get into the 352 area, and if we get into that, for a full expansion to become a Stanford resident in that field you've got to be in the stratosphere as far as your qualifications and ability. You start out in the top probably ten percent, if not higher, of the medical residents in the country, medical graduates who go into specialty training.

"So if he's at the bottom of his class he's probably still at the 80th or 90th percentile. The fact that he was performing below average by Stanford's standards doesn't prove anything, and that opens up a trial within a trial as to what that means in the larger context."

The impeachment here was on a collateral issue; the reasons for Robbins's termination from the Stanford residency program were not pivotal to the case. Hinson's proffered impeaching evidence (that Robbins was terminated for performing below Stanford's standards) was marginal and based on Dr. Simmons's speculation. Admission of the evidence threatened extended hearings on the collateral issues of how well (or poorly) Robbins performed at Stanford and the rigorousness of Stanford University's standards. Under these circumstances, the trial court did not abuse its discretion in excluding this evidence under Evidence Code section 352.

Similarly, the trial court acted within its discretion in excluding the evidence relating to Robbins's termination of staff privileges at Sharp Memorial Hospital. The evidence proffered by the parties indicated there was a substantial dispute as to the reasons Robbins's staff privileges were suspended and whether the suspension was justified.[13] Introduction of the evidence threatened undue consumption of time, and the court was thus justified in excluding the evidence on that basis.

## II

### Sufficiency of the Evidence

Hinson contends the evidence was insufficient to support the jury's verdict in favor of Robbins.

When the factual findings of the jury are attacked for insufficiency of evidence, our duty begins and ends with the determination as to whether there is *any* substantial evidence to support the findings. (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740].) Under the substantial evidence rule, all the evidence most favorable to the respondent must be accepted as true and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].) The appellate court has no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757], disapproved on other grounds in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].)

Here, all the physicians agreed Robbins achieved a poor result but disagreed as to the cause. Hinson's experts testified Robbins was negligent.

---

[13] Robbins apparently filed a suit to challenge the suspension of privileges. This suit was eventually dismissed. Hinson, in her argument, conceded "the reason he dismissed the case may have been financial more than other reasons."

They testified he "over operated" on her nose, removed too much cartilage and tissue, poorly placed the chin implant and was delinquent in failing to remove the chin implant sooner because there were signs the implant was eroding or had eroded through the skin and the area had become infected. In contrast, Robbins's experts testified he was not negligent. They testified Hinson's problems with her nose and chin were due to her body's asymmetrical and excessive scarring. They disputed Hinson's evidence that Robbins removed excessive tissue or cartilage and that the chin implant was in danger of eroding through the skin or had become infected before its removal.

Hinson asserts "[t]he defense experts failed to rebut [the evidence of negligence] because they all admitted that they could not tell whether or not the surgery and treatment was performed negligently." This assertion mischaracterizes the evidence. The defense experts admitted only that they could not tell solely from reviewing Robbins's operative reports whether he had been negligent because while the reports indicated Robbins used correct procedures, there was no way of telling, from the reports themselves, whether the procedures were properly performed. The testimony of the defense experts, however, was not based solely on a review of Robbins's operative reports.

The opinions were also based on the operative reports of Dr. Alexander (e.g., noting a release of scar tissue caused the tip of the nose to drop, a result indicating Robbins had not removed too much cartilage or tissue); the operative report of Dr. Shean (indicating the presence of cartilage which Dr. Alexander had stated was missing); knowledge a bad result can occur despite good surgical treatment; and knowledge excessive and asymmetrical scarring is a complication which can occur in the absence of negligence.

The evidence was sufficient to support the jury's verdict.

### III

*Evidence Code Section 1157*

■ Hinson contends the trial court erred in applying Evidence Code section 1157 to deny her discovery requests for documents from Clairemont Community Hospital, Sharp Memorial Hospital and Tri-City Hospital for Robbins's applications and reapplications for staff privileges and for information whether the hospitals had ever denied, suspended, revoked or terminated Robbins's staff privileges.

Evidence Code section 1157, in pertinent part, provides: "Neither the proceedings nor the records of organized committees of medical . . . staffs

in hospitals having the responsibility of evaluation and improvement of the quality of care rendered in the hospital . . . shall be subject to discovery."

Robbins argues both a physician's application for staff privileges as well as the decision to deny, suspend or terminate a physician's staff privileges are protected from discovery because it would require the release of information of "investigative and evaluative activities of [a peer review committee]." (See *Santa Rosa Memorial Hospital* v. *Superior Court* (1985) 174 Cal.App.3d 711, 724 [220 Cal.Rptr. 236].) Robbins explains an application for privileges is reviewed by a medical staff and the denial, suspension or termination of staff privileges derives from the investigation and report of such a committee. In other words, Robbins argues Evidence Code section 1157 protects everything which touches upon a medical staff committee. Neither the legislative purpose of Evidence Code section 1157 nor its interpretation by the courts supports such a broad construction.

■ The purpose behind Evidence Code section 1157 was explained by the court in *Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623, 629 [115 Cal.Rptr. 317] as follows: "Evidence Code section 1157 expresses a legislative judgment that the public interest in medical staff candor extends beyond damage immunity and requires a degree of confidentiality. It was enacted in 1968 in apparent response to this court's decision in *Kenney* v. *Superior Court* (1967) 255 Cal.App.2d 106 [63 Cal.Rptr. 84]. There we sustained a malpractice plaintiff's claim to discovery of hospital staff records which might reveal information bearing upon the competence of the defendant doctor. In *Kenney* only the doctor was a defendant, not the hospital. Nevertheless, a public policy question was raised by malpractice plaintiffs' access to medical files revealing committee investigations and appraisals of their peers. Section 1157 was enacted upon the theory that external access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. It evinces a legislative judgment that the quality of in-hospital medical practice will be elevated by armoring staff inquiries with a measure of confidentiality." (*Id.* at p. 629, fn. omitted; see also *West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 854 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257], quoting this language with approval.)

The privilege contained in Evidence Code section 1157 "applies *only* to records of and proceedings before medical investigative committees." (*Schulz* v. *Superior Court* (1977) 66 Cal.App.3d 440, 446 [136 Cal.Rptr. 67], italics added.) As the court explained in *Santa Rosa Memorial Hospital* v. *Superior Court, supra*, 174 Cal.App.3d 711, 724, 726-727: "Information developed or obtained by hospital administrators or others which does not derive from an investigation into the quality of care or the evaluation there-

of by a medical staff committee, and which does not disclose the investigative and evaluative activities of such a committee, is not rendered immune from discovery under section 1157 merely because it is later placed in the possession of a medical staff committee or made known to committee members; and this may be so even if the information in question may be relevant in a general way to the investigative and evaluative functions of the committee. Just as ' "a party cannot [under the attorney-client privilege] conceal a fact merely by revealing it to his lawyer" ' [citations] . . . , a hospital cannot render its files immune from discovery simply by disclosing them to a medical staff committee. Hospital administrators cannot, in other words, evade their concurrent duty to insure the adequacy of medical care provided patients at their facility . . . simply by purporting to have delegated that entire responsibility to medical staff committees. The responsibilities of hospital administrators pertaining to the quality of in-hospital care will, of course, usually be related to the similar duties of medical staff committees. Nonetheless, the responsibilities of hospital administrators are independent of those resting with medical staff committees.

" . . . . . . . . . . . . . " . . . .

"[S]ection 1157 does not shield from discovery administrative activities which, while related to, are independent of the investigative and evaluative activities of medical staff committees. 'The medical staff immunity described in section 1157 . . . does not embrace the files of the hospital administration (as distinguished from staff).' [Citations.]"

 We conclude neither an application for staff privileges nor the fact a physician's privileges have been denied, suspended or terminated prima facie fall within the scope of Evidence Code section 1157. An application for staff privileges is not included within Evidence Code section 1157 since the application is neither necessarily a "proceeding" nor a "record" of a committee; it is a document prepared and completed by an individual physician. As the *Santa Rosa* case explains, the mere fact information is placed in a medical staff committee's files does not render information immune from discovery. (*Santa Rosa Memorial Hospital* v. *Superior Court, supra,* 174 Cal.App.3d 711, 724.) *Snell* v. *Superior Court* (1984) 158 Cal.App.3d 44 [204 Cal.Rptr. 200], is not to the contrary since there the personnel files at issue were exclusively maintained by a peer review committee.

Nor do we believe the plain fact (as opposed to the underlying facts of the investigation and evaluation) of denial, suspension or termination of staff privileges is automatically immune from discovery under Evidence Code section 1157. It seems probable that the actual decision to deny, suspend or terminate a particular physician's privileges is an act of the hospital admin-

istration rather than that of a medical staff committee. (Compare *Brown* v. *Superior Court* (1985) 168 Cal.App.3d 489 [214 Cal.Rptr. 266], where a medical malpractice plaintiff was permitted to discover whether a hospital had evaluated or screened the defendant doctor before granting staff privileges.) Indeed, the record here shows the Clairemont Community Hospital Board of Governors approved, disapproved or conditioned staff appointments and reappointments.

Nevertheless, while we believe both Robbins's application for privileges and the fact of any denial, suspension or termination of hospital staff privileges were potentially discoverable, we conclude reversal is not required.

Here, Hinson requested not only Robbins's applications or reapplications for staff privileges and whether his privileges had ever been denied, suspended or terminated, but also other information clearly within the scope of Evidence Code section 1157.[14] While the Sharp Memorial Hospital order expressly refers to Evidence Code section 1157, the Clairemont Community Hospital order states only some documents were covered by Evidence Code section 1157 and the Tri-City order makes no mention of section 1157 (it refers only to "the court's understanding of the current state of the law on the issues to be decided").

Additionally, the orders were made not long before the originally scheduled trial date of May 19, 1986. The orders involving Clairemont Community Hospital and Tri-City Hospital both refer to the impending trial and the Clairemont order expressly provides "should the current trial date of May 19, 1986 be continued, the plaintiff shall have the right to renew her motion . . . ." Trial actually began in April 1987. Nothing in the record indicates Hinson pursued the matter in the trial court during the interim.[15]

---

[14] For example, Hinson requested the following from Sharp Memorial Hospital:

"1. Any and all files, notes, minutes, correspondence, memoranda, or other documents which refer to or relate to any application for appointment to the hospital medical staff of the hospital by Harrison Robbins, M.D.

"2. Any and all files, notes, minutes, correspondence, memoranda, or other documents which refer to or relate to any and all applications for reappointment to the hospital medical staff by Harrison Robbins, M.D.

"3. Any and all files, notes, minutes, correspondence, memoranda or other documents which refer to or relate to any denial by the hospital of any application for appointment to the medical staff by Harrison Robbins, M.D.

"4. Any and all files, notes, minutes, correspondence, memoranda, or other documents which refer to or relate to any suspension, revocation, or other action taken by the hospital which modified, vacated, or terminated any appointment or reappointment of Harrison Robbins, M.D. to the medical staff of the hospital."

Obviously, files, notes, minutes, correspondence, memoranda or other documents which are part of a medical staff committee's proceedings and report are protected by Evidence Code section 1157.

[15] Hinson did file a petition for a writ in this court, which was denied, and thereafter filed a petition with the Supreme Court which also was denied.

At trial, Hinson made some argument to the trial court concerning discovery from Clairemont Community Hospital. Clairemont's counsel expressed some confusion as to what documents Hinson was seeking. The court observed the possible need for an in camera hearing to determine what documents should be produced and then stated: "I think counsel ought to talk about those issues and we can get back to that." Hinson did not raise the issue again to the court. Nor did Hinson pursue these issues in her examination of the witnesses.

Furthermore, Hinson, at oral argument, stated the evidence was relevant to establishing Robbins had failed to meet the training/experience component of the standard of care for medical malpractice. As we explained in section I, that component looks only to threshold qualifications. Evidence generally may not be introduced to show the defendant/physician's competence or incompetence in the past to establish he was negligent in a particular instance.

Under these circumstances, where the orders were made shortly before the original trial date, where Hinson did not thereafter follow up on her requests in the superior court, where it is unclear whether the requested discovery was denied pursuant to Evidence Code section 1157 or for other legitimate reasons and where denial of discovery appears nonprejudicial, we conclude reversal of the judgment on this basis would be inappropriate.

## IV

### Bifurcation of Issues

Hinson contends the trial court's order bifurcating trial of the issue of the hospital's *Elam*[16] liability from trial of Robbins's medical malpractice liability denied her a fair trial because it resulted in the trial court's ruling excluding the evidence discussed in part I, *ante.*

As we discussed in part I, the trial court properly excluded evidence relating to Robbins's education, training and suspension of staff privileges. The bifurcation did not cause evidence to be excluded or result in the denial of a fair trial. No reversal is required on this ground.[17]

---

[16] *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156]. In *Elam* the court held a hospital could be liable for "corporate negligence" for "negligently screening the competency of its medical staff to insure the adequacy of medical care rendered to patients at its facility." (*Id.* at p. 346.)

[17] Hinson also contends the court erred in granting bifurcation because the court was bound by a preexisting order and erred in finding bifurcation promoted judicial economy. We need not discuss these contentions in light of our finding Hinson suffered no prejudice.

## V

### *Civil Code Section 1431.2*

Hinson contends the court erred in retroactively applying Civil Code section 1431.2 to the issue of joint and several liability for noneconomic damages. Since no damages were awarded, the trial court never had an opportunity to apply Civil Code section 1431.2 and no reversal is required on this ground.

### DISPOSITION

The judgment is affirmed.

Wiener, J., and Froehlich, J., concurred.

On April 11, 1990, the opinion was modified to read as printed above.