[No. D031252. Fourth Dist., Div. One. Jan. 22, 1999.]

In re CASEY D., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
DARIA D. et al., Defendants and Appellants.

## COUNSEL

Pierce M. Kavahagh, under appointment by the Court of Appeal, for Defendant and Appellant Daria D.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant Vincent D.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Kathryn E. Krug, Deputy County Counsel, for Plaintiff and Respondent.

Barbara A. Smith, under appointment by the Court of Appeal, for Minor.

## OPINION

**KREMER, P. J.**—Daria D. and Vincent D., the parents of Casey D., appeal the court's denial of their Welfare and Institutions Code[1] section 388 petitions seeking custody of Casey or a plan of long-term foster care and the court's decision to terminate their parental rights.

On appeal, the parents contend reversal is required because the termination of reunification services at the six-month review hearing constituted a violation of their due process rights; their section 388 petitions established changed circumstances indicating a return of Casey to their custody or a plan of long-term foster care would be in Casey's best interests; and parental rights should not have been terminated because the evidence showed a

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

beneficial parent/child relationship existed between Casey and her mother. We affirm.

FACTS

Casey was born in December 1996 with a positive toxicology for morphine/heroin. Both parents had a long history of drug abuse problems and were heroin addicts. There had been previous contacts with the San Diego County Health and Human Services Agency (Agency). In 1993 there was a voluntary contract between the parents and Agency involving their daughter Veronica, who was born in June 1989. Daria did well in a drug treatment program and the case was closed in May 1994. Calls were made to Agency hotline in December 1994 about a lack of supervision and in June 1995 about the caretaker using drugs. In October 1995 the parents had their second child, Amber, who, like Casey, was born with a positive toxicology for morphine/heroin and was removed from parental custody and Agency intervened. When Casey was born in December 1996, Amber was living with her maternal grandmother and the parents were noncompliant in their plan to reunify with Amber.

In March 1997 the court declared Casey a dependent child, removed her from parental custody and ordered reunification services for the parents, including participating in a drug treatment program, attending Narcotics Anonymous (NA) and drug testing. The court found there were no relatives available for placement. At the time of the six-month review hearing held October 29, 1997, the parents had still not complied with their reunification plan. The court terminated reunification services and set the matter for a section 366.26 permanency planning hearing. The parents filed a writ petition in this court challenging the constitutionality of terminating reunification services at the six-month review hearing and the sufficiency of the evidence to support the court's findings as to the reasonableness of reunification services and that it would be detrimental to return Casey to their custody. We upheld the constitutionality of the statute allowing termination of reunification services at the six-month review hearing and affirmed the trial court's decision in *Daria D.* v. *Superior Court* (1998) 61 Cal.App.4th 606 [71 Cal.Rptr.2d 668].

Just days before the scheduled March 31 permanency planning hearing (which had been continued from February 25, 1998), the parents separately filed section 388 petitions alleging changed circumstances and seeking return of Casey to their custody or the selection of a long-term plan of foster care and the provision of reunification services to the parents.

The evidence presented at the hearing indicated Vincent had been sober since early July 1997; was taking the drug, Orlaam, for his heroin addiction;

was randomly drug testing; attending NA meetings three to four times a week; was working on step five of a twelve-step program; had a sponsor and was employed. Vincent had supervised visitation with Casey once a week. Daria was invited to attend Vincent's visits. In January 1998 Vincent began visiting Casey after admittedly "a long time" of not visiting. During the February and March visits, the parents arrived late and left early several times. By the time of the hearing, Casey was just beginning to be calm around Vincent if Daria was also present.

Daria had attended the Options for Recovery (Options) drug treatment program "off and on" for more than three years. During 1997 Daria had at least three or four relapses between January and October. During each relapse, Daria probably used drugs more than once. During a relapse involving heroin, an individual could be "unavailable" to parent a child for about a 24-hour period.

Beginning in November 1997, Daria switched from methadone treatment for her heroin addiction to Orlaam. Daria's drug treatment counselor noticed Daria was less depressed, taking care of necessary tasks, obtaining treatment and taking care of her responsibilities at home much better while on the Orlaam than she had on the methadone. Daria began regularly attending the Options program three days a week from 11:00 a.m. to 3:00 p.m. She regularly attended NA meetings and had had a sponsor for about four months. Daria, however, was not yet working on a 12-step program and had not yet written her autobiography, which was "a significant part of the recovery process" in the drug treatment program in which Daria was enrolled.

Daria had begun an anger management class but had not completed it due to the cost of the class. The social worker reported two weeks earlier Vincent had called the social worker to discuss changing his visitation. Daria was talking very loudly in the background. When Vincent asked her to be quiet, Daria "went off verbally, escalated, started screaming obscenities, threatening to take [the social worker] to court" and was "threatening obscenities about [the social worker's] supervisor." At some point the social worker no longer heard Daria in the background. Vincent explained the Options van had arrived and picked up Daria. The social worker also testified the foster mother had reported when she spoke with Vincent on the phone, Daria was constantly on the phone, coaching Vincent, would get upset and irritated and one time made threats to the foster mother's adult daughter.

Daria had supervised visits with Casey at the Options program. The program coordinator at the Options program believed Daria and Casey were

"very well bonded" with Casey willingly going to Daria when she was dropped off. The bonding between Casey and her mother had increased, with Casey preferring to be held by Daria rather than the counselor. Daria showed "really good mothering" and believed Casey could safely be returned to her parents' custody. Daria's case manager stated Casey and Daria were "emotionally attached" and the case manager stated she would "have no problem" with Casey being immediately returned to her parents' physical custody. She believed Casey should live with her parents. She was unfamiliar with Vincent's drug history, but knew he was on Orlaam and was employed.

The social worker disagreed with the opinions of Daria's counselors that Casey could be immediately returned to the parents' physical custody. She stated the parents had "a very cyclical history" of drug use, drug treatment and relapse over a period of four and a half years. There was "a very discernible pattern" where once Agency intervened, the parents would involve themselves in various services when required by outside agencies in order to reunify their family. Once the pressure of the outside agencies or the requirements were lifted, the parents were unable to sustain their efforts and Agency was required to intervene again. This had happened in 1993 when there was a voluntary contract between Agency and the parents; in 1995 when their child Amber was born with a positive toxicology; and in 1996 when Casey was born with a positive toxicology.

The social worker also disagreed with Daria's witnesses as to the relationship between Daria and Casey. She believed the people with the Options program, who provided great support for Daria, tended to either put the best face on Daria's relationship with Casey or saw things in the relationship which were not present. The social worker had observed Casey in a variety of settings and with a variety of people. The social worker in her assessment report noted Casey did not show an exclusive preference for the parents as caretakers and she had not "seen the strong reciprocal relationship emanating from Casey towards her mother and father that would indicate that she sees these people as anything more than part-time day care providers." She noted Casey did have a strong preference for her foster mother whom she called "ma-ma," had a "special smile" reserved for the foster mother and would always choose to go to the foster mother if she were tired, fussy, hurt or in need of reassurance. Casey was a generally friendly, outgoing child who responded positively to people with whom she had some familiarity. Casey smiled and reached out to the social worker. The social worker, while waiting for Daria to arrive at the Options program, had observed four different people who had approached Casey "with a happy, 'Hi Casey!,' and picked her up to hold her. Casey went willingly to all four [people] and was content to be in their arms."

The social worker noted the parents had arrived late or left early for several of the visits not held at the Options program in February and March 1998. During these visits, the foster mother would sit at a distance. Casey would notice the foster mother, brighten, head for her, and "babble[] to her." The foster mother would direct Casey back to Daria.

The social worker did not believe Casey could be immediately returned to parental custody without risking physical or emotional harm to Casey given the parents' history of substance abuse and Casey's very young age. The oldest daughter, Veronica, who was living with the parents, was over eight years old and had other people in her life to whom she could turn, e.g., her grandmother or teachers, while Casey, because she was so young (about sixteen months old), had no means to protect herself. The social worker testified it would be in Casey's best interests to remain where she was, where she was afforded medical and emotional support, encouragement, love and had extremely responsive foster parents. Casey had a continuing need for stability which would not be met by returning her to the parents.

The court denied the petitions. The court noted the parents had "extensive" drug histories. The court stated it believed there were circumstances where a heroin addict can show a good chance that he or she "will continue in his or her day-to-day vigilance against relapse" but Daria had not made such a showing. The court stated Daria was "attempting to get her life together" but had not established changed circumstances, and had failed to demonstrate an ability to maintain a sober lifestyle. The court noted her extensive drug history, her awareness of the "consequences of relapse," and yet she had given birth to two babies who had been born with morphine/heroin in their systems, and knew under those circumstances Agency was going to be back in her life.

As to Vincent, the court found his nine months of sobriety had established changed circumstances but it would not be in Casey's best interests to return her to Vincent's custody because there was no relationship between Vincent and Casey; Casey was only comfortable around Vincent if Daria were present.

Thereafter the court held the permanency planning hearing. The social worker testified the relationship between Casey and her mother was one of a "friendly visitor." Casey recognized Daria "as a fine person to be with" and someone with whom she had "a good time" but the relationship was not parent-child in nature; Casey did not look to Daria for day-to-day nurturing, stability, encouragement or support. As to Vincent, the social worker testified his relationship to Casey was less than a friendly visitor; Casey had just recently begun to respond more positively to Vincent.

The court found there existed no parent-child relationship between Casey and her parents such that termination of parental rights would be detrimental to Casey; Casey was likely to be adopted and the court terminated parental rights.

DISCUSSION

I

*Termination of Reunification Services—Denial of Due Process*

The parents contend the revisions to the juvenile dependency scheme which allow termination of reunification services at the six-month review hearing (see §§ 361.5, subd. (a)(2), 366.21, subd. (e)) violated the parents' substantive due process rights. They contend the revisions violate "minimum federal constitutional protections" by providing less reunification time than guaranteed by federal statutory provisions.

This challenge to the termination of reunification services at the six-month review hearing is not timely; it was a matter which was cognizable on an appeal from orders made at the six-month review hearing. The time for appealing the orders made at the six-month review hearing has long since passed. .(See *In re Edward H.* (1996) 43 Cal.App.4th 584, 590-591 [50 Cal.Rptr.2d 745]; *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391 [49 Cal.Rptr.2d 175].)

Additionally, the due process arguments were previously raised by the parents in a writ petition and we rejected their arguments on the merits in *Daria D. v. Superior Court, supra,* 61 Cal.App.4th 606, 610-613. Daria contends we did not address her current contention in the prior opinion, i.e., that federal statutes require a minimum of 12 months of reunification services and California cannot provide less protection than minimum federal constitutional protections.

Initially, we note Daria should have raised this particular claim in the prior writ petition or in an appeal from the orders made at the six-month review hearing. Second, the rule Daria cites, i.e., that a state cannot provide less protection for its citizens than that guaranteed by the federal Constitution (see, e.g., *Stone v. Superior Court* (1982) 31 Cal.3d 503, 509-510 [183 Cal.Rptr. 647, 646 P.2d 809]), has no application here; Daria is citing federal statutory law rather than federal constitutional law. Finally, we note that while she asserts federal statutory law mandates 12 months of reunification services as a condition of federal funding, she has failed to support that

assertion with a citation to any particular federal statute. Instead, she cites to the entire statutory scheme for the federal program of Aid to Families with Dependent Children (42 U.S.C. § 601 et seq.) and cites a statute providing the general purpose and authorization for block grants to states for social services (42 U.S.C. § 1397). She thus failed to meet her burden of showing error; she has failed to show any legal support for her assertion.[2]

No reversal is merited on this ground.

## II

### *Denial of Section 388 Petitions*

The parents contend the court erred in denying their section 388 petitions alleging a change of circumstances.

Section 388 permits a parent to petition the court on the basis of a change of circumstances or new evidence for a hearing to change, modify or set aside a previous order in the dependency. The parent bears the burden of showing both a change of circumstance exists and that the proposed change is in the child's best interests. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703 [11 Cal.Rptr.2d 290].) A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. (*In re Edward H., supra,* 43 Cal.App.4th 584, 594.) " '[C]hildhood does not wait for the parent to become adequate.' " (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 [29 Cal.Rptr.2d 654].)

On appeal, we will not reverse the decision of the juvenile court unless the parent establishes the trial court abused its discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

### A. *Mother's Petition*

Daria asserts she "convincingly established that she had rehabilitated herself and was drug free" and that "she was a loving and caring

---

[2]Additionally, we note the parents in this case, as a practical matter, received more than six months of reunification services. The court ordered reunification services for the parents on January 15, 1997, at the time it determined a prima facie case had been made that Casey was in need of the juvenile court's protection. Reunification services for the parents were not terminated in this case until October 29, 1997. Thus, the parents had received more than nine months of reunification services at the time services were terminated. Moreover, presumably, the parents already had been receiving reunification services at the time the prima facie showing was made as to Casey since they were then involved in a dependency proceeding involving Casey's sister who was born in 1995.

mother who interacted positively with all her children and whose custody of one non-dependent child demonstrated her ability to provide adequate care."[3] She asserts that once she showed by a preponderance of the evidence that there existed a change in circumstances, Agency "was required to prove, by clear and convincing evidence, that Casey would be at risk if she were to be returned to her mother. (Sec. 366.2(e).)"

Initially, we note Daria is in error when she states section 366.2, subdivision (e) supports a conclusion that once she showed changed circumstances, Agency was required to show by clear and convincing evidence that Casey would be at risk if she were returned to Daria. Section 366.2, subdivision (e) applies to the six-month review hearing, not to section 388 petitions filed after reunification services have been terminated and just prior to the permanency planning hearing. At the time Daria filed her petition, the focus of the dependency proceedings had shifted from reunification to the child's need for a stable and permanent home. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 420 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) Daria had the burden of showing not only changed circumstances but that a change in the child's placement would be in the best interests of the child in order to prevail on her section 388 petition. (See *In re Michael B., supra,* 8 Cal.App.4th 1698, 1703.)

We find no abuse of discretion by the trial court in denying Daria's petition, filed on the eve of the originally scheduled permanency planning hearing. The evidence indicated Daria had been drug free only since November 1997. Other evidence indicated Daria had an extensive drug history with a tendency to engage in treatment programs when required to do so by outside agencies and then relapse once the requirement was lifted. Further, the evidence indicated Daria was not yet working on a 12-step program and had not yet written her autobiography, which was a significant requirement of Daria's drug treatment program.

Further, while the evidence was clear Daria was loving toward Casey and behaved appropriately toward her, the court, who heard the testimony, was entitled to reject the opinions of the Options program coordinator and case manager that Casey could be immediately returned to parental care and to accept the opinion of the social worker that there was a risk of detriment in returning Casey to parental custody because of the parents' extensive drug histories; pattern of maintaining drug treatment only when motivated by the

[3]The parents also argue the evidence of a strong bond between Daria and Casey supported returning Casey to parental custody. In part III, we discuss this issue and support the court's conclusion the bond was not as strong as asserted by the parents.

desire to reunify the family and required by outside agencies; and Casey's young age. Casey's young age (about 16 months) meant that she was too young to be able to protect herself if the parents should relapse, in contrast to her oldest sister, Veronica, who was about 8 years old and had the ability to turn to others for help if needed.

Finally, because the court had found Daria's circumstances were changing, rather than changed, it was entitled to conclude that granting the parents' requests for further reunification services or long-term foster care was not in Casey's best interests given Casey's strong and immediate need for stability.

We find no abuse of discretion in the court's denial of Daria's petition.

### B. *Father's Section 388 Petition*

Vincent's petition sought return of Casey to both parents' custody, to Daria's custody alone with Vincent leaving the family home or, in the alternative, to grant additional reunification services and continue foster care.

The court found Vincent's nine-month period of being drug free had established a change of circumstances but that returning Casey to his custody would not be in Casey's best interests because Vincent did not have a good relationship with Casey; Casey was comfortable around Vincent only if Daria were present. Further, as discussed above, the court found Daria had not established changed circumstances and return of Casey to parental custody or extending foster care and reunification services was not in Casey's best interests.

We find no abuse of discretion in the denial of Vincent's petition, given his lack of relationship with Casey, Daria's lack of sufficiently changed circumstances, Casey's young age and Casey's current need for stability.

No reversal is merited on the ground the court improperly denied the section 388 petitions for modification.

### III

*Termination of Parental Rights Beneficial Parent-Child Relationship*

The parents contend the court erred in finding there did not exist a beneficial parent-child relationship between Daria and her mother such that

termination of parental rights would be detrimental to Casey. They do not contest the court's finding Casey was likely to be adopted if parental rights were terminated.

 At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child. If a child is likely to be adopted, adoption is the plan preferred by the Legislature. (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924 [3 Cal.Rptr.2d 768].) The Legislature has provided an exception to the general rule of adoption: the court should not order a permanent plan of adoption when termination of parental rights would be detrimental to the child because "[t]he parents . . . have maintained regular visitation and contact with the [child] and the [child] would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(A).)

In *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535], we explained:

"In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.

"Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."

Vincent argues the *Autumn H.* standard "renders the exception meaningless." He points out that by the time of the section 366.26 hearings, after reunification services have been terminated, "by the very nature of the proceedings the parents do not have day-to-day interaction, companionship and shared experiences with the child" since at that point the child is being

raised by foster parents. Vincent asserts, "It is hard to fathom that the Legislature intended its exception to termination of parental rights to be interpreted as requiring a parent/child relationship based on day-to-day care and interaction that simply does not exist at the point in time when the court is considering termination of parental rights." He argues "there is no 'legislative intent' to create an impossible hurdle for the parents to overcome." He urges us to overturn the *Autumn H.* decision. We decline to do so.

Initially, we note the *Autumn H.* standard has been followed by other courts. (See, e.g., *In re Amanda D.* (1997) 55 Cal.App.4th 813, 821-822 [64 Cal.Rptr.2d 108] [Fourth Dist., Div. Three; specifically declined to reject *Autumn H.* standard]; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342 [63 Cal.Rptr.2d 562] [Fifth Dist.]; *In re Teneka W.* (1995) 37 Cal.App.4th 721, 728-729 [43 Cal.Rptr.2d 666] [Second Dist., Div. Two]; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 [35 Cal.Rptr.2d 162] [Sixth Dist.].)

Second, we observe the *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact. Rather, the decision attempts to describe the nature of the beneficial parent-child exception to the general rule that adoption should be ordered when the child is likely to be adopted. Another way of stating the beneficial parent-child concept described in *Autumn H.* is: a relationship characteristically arising from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction. The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption. That showing will be difficult to make in the situation, such as the one here, where the parents have essentially never had custody of the child nor advanced beyond supervised visitation. The difficulty is due to the factual circumstances of the parents in failing to reunify and establish a parental, rather than caretaker or friendly visitor relationship with the child.

Here, we do not have the exceptional case where a beneficial parent-child relationship existed at the time of the section 366.26 hearing. Neither parent argues such a relationship existed between Casey and her father. The evidence indicated that Casey had only recently become calm

around Vincent and then only when Daria was present. Both parents argue the evidence established the existence of such a relationship between Casey and Daria. They challenge the sufficiency of the evidence to support the court's conclusion a beneficial parental-child relationship did not exist.

There was no dispute Daria was loving toward Casey and was appropriate with Casey during her visits.[4] There was a dispute as to the nature of the relationship. The Options program coordinator and Daria's case manager testified Daria and Casey had a strong, positive relationship. Daria's case manager testified she believed Daria and Casey were "emotionally attached" and that Casey knew Daria was her mother. The program coordinator opined Daria and Casey were "very well bonded" and that the bonding had increased over the past couple of months, e.g., that Casey would now cry and turn to Daria when the counselor tried to hold Casey. She testified that "a few times" Casey had called Daria "Mommy."

The social worker, who had seen Daria and Casey in a variety of settings, disagreed with the opinions of Daria's counselor and case manager. She indicated Daria's relationship with Casey was that of a "friendly visitor," a person whom Casey enjoyed. The social worker had "not seen the strong reciprocal relationship emanating from Casey towards her mother and father that would indicate that she sees these people as anything more than part-time day care providers." She noted that Casey was an outgoing, friendly child who responded positively to anyone with whom she had some familiarity; Casey would smile and reach out to the social worker or to people at the Options program who were friendly to her. Casey's preference was for her foster mother whom she called "ma-ma," turned to when she was tired, fussy, hurt or in need of reassurance and for whom she had a special smile. The social worker testified she did not believe it would be detrimental to Casey to terminate parental rights.

It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that

---

[4]Daria asserts it was only necessary that she show the relationship with Casey was "beneficial." This is not true. "The existence of interaction between natural parent and child will always confer some incidental benefit to the child. Nevertheless, the exception in section 366.26, subdivision (c)(1)(A), requires that the parent-child relationship promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. (*In re Autumn H.*[, *supra*,] 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].)" (*In re Lorenzo C., supra*, 54 Cal.App.4th 1330, 1342.) In other words, the parent must show more than that the relationship is "beneficial."

evidence. (*Hinson* v. *Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, 1125 [267 Cal.Rptr. 503], disapproved on other grounds in *Alexander* v. *Superior Court* (1993) 5 Cal.4th 1218, 1228, fn. 10 [23 Cal.Rptr.2d 397, 859 P.2d 96].) Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

 The trial court was entitled to find the social worker credible and to give greater weight to her assessments and testimony. The evidence from the social worker provided substantial evidence to support the court's conclusion that no beneficial parent-child relationship existed such that termination of parental rights would be detrimental to Casey. The parents are essentially asking us to reweigh the evidence and to substitute their judgment for that of the trial court. We decline to do so.

No reversal is merited on this ground.

## IV

### Relative Placement

Daria contends once it was determined Casey could not be placed with her parents, then Casey should have been placed with a family member such as the maternal grandmother who was caring for Casey's sister, Amber, or "then surely with any of a host of concerned relatives living in California, New York, and Florida." Daria complains Agency failed to investigate these relatives before placing Casey in foster care.[5]

Daria's contention appears to relate to Casey's initial placement at the disposition hearing and not to any issue raised either in the section 388 petition or at the section 366.26 hearing. At the dispositional hearing, the court specifically found there were no relatives available for placement. The time for appealing that finding has long since expired. The section 388 petitions sought return of Casey to parental custody or long-term foster care for Casey with additional reunification services to the parents. The issue at the section 366.26 hearing was, given that Casey was likely to be adopted, did there exist a beneficial parent-child relationship so that termination of parental rights would be detrimental to Casey. Daria does not point to

---

[5]Agency contends Daria lacks standing to raise this issue, i.e., the rights of extended family members to have contact with Casey. We need not address the standing issue since we conclude Daria did not timely raise this issue or establish any failure by Agency to investigate and consider relative placement.

anywhere in the section 388 or 366.26 proceedings where the issue of relative placement was raised. This is an intensely factual issue (e.g., as to whether relatives were interested in or would be approved for custody); it is not an issue which may be raised for the first time on appeal.

Further, the record reveals Agency did, in fact, consider placing Casey with relatives. At the outset of the dependency, Agency investigated placing Casey with her maternal grandmother, but the grandmother indicated she was not ready to have Casey placed with her. Agency again considered placing Casey with her grandmother in November 1997 in response to the grandmother's communication to the social worker that she would be interested in providing long-term care or adopting Casey if the court ordered. However, the grandmother changed the scheduled date for the social worker to visit the home, then canceled the appointment, saying she would get back in touch with the social worker but never did. The social worker thereafter elicited Daria's help in contacting the maternal grandmother but was unsuccessful. At that time, the grandmother had seen Casey only once and never called to inquire about Casey. No other relative expressed any interest in caring for Casey nor did Daria or Vincent communicate to Agency that any relative (other than the maternal grandmother) would be interested in caring for Casey. Agency fulfilled its obligations.

No reversal is merited on this ground.

DISPOSITION

The orders are affirmed.

Work, J., and Huffman, J., concurred.

A petition for a rehearing was denied February 16, 1999, and appellants' petition for review by the Supreme Court was denied May 19, 1999.