Filed 7/30/21  Avila v. Aszterbaum CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CARMEN D. AVILA, | |
| Plaintiff and Appellant, | G057969 |
| v. | (Super. Ct. No. 30-2016-00862834) |
| MONICA L. ASZTERBAUM, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Walter P. Schwarm, Judge.  Affirmed.  Request for judicial notice.  Granted in part and denied in part.

Carmen D. Avila, in pro. per., for Plaintiff and Appellant.

Schmid & Voiles, Denise H. Greer, Douglas A. Amo and Fredrick James for Defendant and Respondent.

\*                \*                \*

Dr. Monica L. Aszterbaum, M.D., performed surgery on Carmen D. Avila in August 2014. In the surgery, Avila, who was then 55 years old, underwent a total hysterectomy and a bilateral salpingo-oophorectomy.[1] Avila contends that her consent to the BSO was conditional on Aszterbaum discovering evidence of cancer during the surgery; Aszterbaum contends Avila's consent was conditioned on Aszterbaum discovering anything abnormal. During the surgery, Aszterbaum observed cysts on Avila's fallopian tubes; she determined the cysts were abnormal, and proceeded with the BSO.

Avila sued Aszterbaum for professional negligence, failure to obtain informed consent, and medical battery. After nonsuit was granted on the negligence claim, the jury returned special verdicts in favor of Aszterbaum and against Avila on the remaining claims. Avila appealed from the judgment. Substantial evidence supports the judgment, and we affirm.

## STATEMENT OF FACTS[2]

### I.

### AVILA'S FIRST VISIT TO ASZTERBAUM

Avila was first seen by Aszterbaum in April 2014 for a second opinion regarding surgery. Avila was suffering from uterine prolapse, resulting in vaginal pressure and incontinence. Aszterbaum and Avila discussed nonsurgical options, as well as a total laparoscopic vaginal hysterectomy, with a possible BSO. Aszterbaum offered

---

[1] A bilateral salpingo-oophorectomy (sometimes referred to in this opinion as a BSO) is the removal of the ovaries and fallopian tubes in the same surgical procedure.

[2] Because Avila does not challenge on appeal the trial court's order granting nonsuit of her professional negligence cause of action, we do not include in this opinion the facts relating only to that claim.

an anterior colporrhaphy or anterior repair to address Avila's prolapse issue. The procedure recommended by Aszterbaum would use Avila's "native tissue" rather than mesh to support the bladder, rectum, and uterus or vagina.

II.

AVILA'S PREOPERATIVE APPOINTMENT AT ASZTERBAUM'S OFFICE

At a preoperative appointment on July 31, 2014, Avila signed a document entitled "A Message to Patients About Medical/Surgical Risks" that identified the surgical procedure to be performed as "Total laparoscopic hysterectomy, anterior repair, cystoscopy, *possible bilateral salpingo oophorectomy* and poss. total abdominal hysterectomy [tah]." (Italics added.) On the same day, Avila signed a hysterectomy consent form that provided, in part: "I understand that unforeseen conditions may arise and that it may be necessary to perform operations and procedures different from, or in addition to, the hysterectomy described. I authorize and consent to the performance of such additional or different operations and procedures as *are considered necessary and advisable*." (Italics added.)

Aszterbaum's preoperative notes indicate that Avila's appointment was to prepare for "surgery 8/5/14—total laparoscopic hysterectomy, anterior repair, cysto, *possible bso* and possible tah." (Italics added.)

Avila testified: "I saw her again for the pre-op, July 31st. That day, my daughter accompanied me. She was already on vacation, ready to take care of me after the surgery. [¶] We went in to see the doctor. The only thing she told me, in front of my daughter, she said, 'Carmen, at your age, it is best that you remove your ovaries.' [¶] And I asked her, 'Why?' [¶] She told me because she has a lot of patients that, for not having removed their ovaries at my age, now they have cancer. [¶] I told her, 'You just did the Pap smear on me and everything resulted normal. I'm healthy. There's no cancer history in my family, no type of cancer.' [¶] And she told me, 'Think about it. If, on the

3

day of the surgery, I see something unwell.' [¶] I told her, 'Well, in that case, I authorize you to do anything I need. You are the doctor.'"

Avila also testified: "In the pre-op that was in July of '14, the doctor told me that at my age, it was best to take out everything, without having done any evaluation. [¶] . . . [¶] . . . I told her—because this was just two days before my surgery, and she hadn't done any previous evaluation—all my Pap smear and my mammograms have all resulted well, or fine. Because she told me that she had a lot of patients that for not having taken out the ovaries at my age, now came up with cancer. [¶] And I told her, well, *if she saw something that was not right, abnormal, or cancerous, I gave her my authorization for everything necessary. But otherwise, no.* I don't have any cancer story [*sic*] in my family." (Italics added.)

Aszterbaum testified that at the preoperative appointment, she reviewed the procedures to be performed and Avila's consents, and told Avila that a BSO was a possibility depending on what she saw during the surgery. Aszterbaum testified she had Avila's permission to remove her ovaries during surgery if she saw "*something abnormal or cancer.*" (Italics added.)

Aszterbaum also testified that Avila did not say she would refuse the BSO under any circumstances. "Q. And if this patient had said —after hearing your discussion with you and recommendations, had she said, 'You know, Doctor, I don't care what you find, I don't want you to take out my ovaries,' is that something you'd document? [¶] A. Yes. [¶] Q. Why is that? [¶] A. For medical/legal purposes. [¶] Q. Okay. And that's not something she told you here? [¶] A. No. And I don't think, in 29 years, I've ever had somebody—I've never been put in that situation."

III.

AVILA'S SURGERY

On the day of the surgery, Avila signed another consent form reading, in relevant part: "My physician(s) and surgeon(s) have recommended the following

4

operation or procedure:  Total Laparoscopic Hysterectomy, Anterior Repair, Cystoscopy, Possible Bilateral Salpingo-oophorectomy and Possible Total Abdominal Hysterectomy, Removal of skin tags.  . . . [¶] • Upon my authorization and consent, this operation, together with any different or further procedures which in the opinion of my physician(s) or surgeon(s) may be indicated due to an emergency, will be performed on me."  This consent form further provided:  "My signature on this form indicates that:  [¶] • I have read and understand the information provided on this form  [¶] • The operation or procedure set forth above has been adequately explained to me by my physician and/or surgeon including the nature of the procedure, the risks involved, the expected benefits of the procedure, and the alternatives to the procedure  [¶] • I have had a chance to ask questions  [¶] • I have received all of the information I desire concerning the operation or procedure  [¶] • I authorize and consent to the performance of the operation or procedure."

Before the surgery, Avila also signed a "Verification of Consent for Planned Procedures Which Result in Sterility" stating in relevant part:  "This is to certify that I, Avila, Carmen, have been advised by my physician or his/her designee, M. Aszterbaum, MD, that the planned procedure which will be performed on me, total laparoscopic hysterectomy, anterior repair, cystoscopy, possible bilateral salpingo oophorectomy and possible total abdominal hysterectomy is not elective sterilization but for a medical condition that will render me permanently sterile [and] incapable of having children.  I understand that I have the right to obtain a consultation [from] a second physician and withdraw this consent at anytime.  My approximate length of hospital stay and my recover[y] time has been discussed with me and I have had the opportunity to have all my questions addressed."

Regarding the consents signed on the day of surgery, Avila testified:  "They were handed to me, I signed them.  They were not explained.  They were not read.  They were not interpreted.  They're in English.  *I had told the doctor that whatever I needed*

5

*was authorized.*" (Italics added.) Contrary to Avila's testimony that she did not read the consent forms, however, Aszterbaum testified she met with Avila in the preoperative holding area before the surgery, at which time Avila informed her that the consents did not include the removal of a skin tag as they had previously discussed. Aszterbaum agreed, and skin tag removal was added to the consent form and initialed by Avila that morning.

The operating room nurse, who cosigned Avila's consent forms in the preoperative area on the morning of the surgery, testified that she had no difficulty communicating in English with Avila and noted on Avila's consent forms that no Spanish language interpreter was needed. Avila would not have received any medication, particularly anesthesia, before signing all the consent forms.

Aszterbaum's notes from the day of surgery indicate that Avila understood the risks and benefits of surgery and "is willing to proceed." The plan that day read: "Will proceed with definitive surgery in the form of a total laparoscopic hysterectomy with bilateral salpingo-oophorectomy and anterior repair."

During the surgery, Aszterbaum observed abnormalities consisting of multiple paratubal cysts on both of Avila's fallopian tubes. Aszterbaum testified the cysts on Avila's fallopian tubes would not disappear over time, but could become bigger, causing extreme pain, and might eventually require emergency surgery. Additionally, ovarian cancer can originate in the fallopian tubes as well as the ovaries. Aszterbaum therefore made the decision to perform a BSO at that time, "knowing I had permission to

do it if I noted pathology at the time of the surgery." A pathology report found that the cysts were benign.[3]

Aszterbaum spoke to Avila after the surgery and advised her that her ovaries had been removed. Aszterbaum prescribed an estrogen patch for Avila.

A medical expert called by the defense at trial testified that finding multiple paratubal cysts on the fallopian tubes was abnormal and it would have been malpractice not to remove them. It would not have been possible for Aszterbaum to have known whether the cysts were benign or malignant at the time of surgery. The expert reiterated Aszterbaum's testimony that ovarian cancer can start in the fallopian tubes, meaning an abnormal finding regarding the fallopian tubes should not be ignored. The expert also testified that if a patient had signed the consent forms used in this case, a reasonable physician would have no reason to believe the patient had not consented to all of the surgeries identified on the consent forms.

## PROCEDURAL HISTORY

In July 2016, Avila sued Aszterbaum for professional negligence, failure to obtain informed consent, and medical battery. After Avila had presented her case-in-chief, the trial court granted Aszterbaum's nonsuit motion as to the claim for professional negligence.

The jury returned two special verdict forms. The first read as follows:

"We, the jury in the above-entitled action, find the following special verdict on the questions submitted to us:

---

[3] A transcription of Aszterbaum's surgical notes, which was admitted at trial, says "tubes and ovaries within normal limits" and does not mention any cysts. Aszterbaum testified this was either an inadvertent omission in dictation on her part or an error in the transcription. The pathology report references "[m]ultiple fluid-filled paratubal cysts," with those on the right tube measuring up to .7 centimeters, and those on the left measuring up to .8 centimeters.

"1. Did Dr. Monica Aszterbaum perform a bilateral salpingo-oophorectomy on Carmen Avila?

"If your answer to question number 1 was yes, then answer question number 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

"_____X_____ Yes            _____ No

"2. Did Dr. Monica Aszterbaum fail to disclose to Carmen Avila the important potential results and risks of, and alternatives to the possible bilateral salpingo-oophorectomy?

"_____ Yes            _____X_____ No

"If you answered yes to question number 2, then answer question number 3. If you answered no to question number 2, stop here, answer no further questions, and have the presiding juror sign and date this form."

The second special verdict form read:

"We, the jury in the above entitled action, find the following special verdict on the questions submitted to us:

"1a. Did Carmen Avila consent to a bilateral salpingo-oophorectomy to remove her ovaries on the condition her ovaries would be removed if Dr. Aszterbaum saw they were cancerous as determined during the surgery?

"_____ Yes            _____X_____ No

"Go to question number 1b.

"1b. Did Carmen Avila consent to a bilateral salpingo-oophorectomy to remove her ovaries on the condition that her ovaries would be removed if Dr. Aszterbaum determined there were abnormalities as determined during the surgery?

"_____X_____ Yes            _____ No

8

"If you answered yes to question number 1a or number 1b, then answer question number 2.  If you answered no to both question number 1a and question number 1b, then answer question number 3.

"2.  Did Dr. Monica Aszterbaum proceed with the bilateral salpingo-oophorectomy without the condition in question 1a and/or 1b having occurred?

"_____ Yes          ___X___ No

"If you answered yes to question number 2, then answer question number 3. If you answered no to question number 2, stop here, answer no further questions, and have the presiding juror sign and date this form."

Judgment was entered in favor of Aszterbaum, and Avila appealed.

**DISCUSSION**

I.

AVILA'S REQUEST FOR TRANSMISSION OF NONADMITTED EXHIBITS
AND REQUEST FOR JUDICIAL NOTICE

The exhibits admitted at trial were transmitted to this court.  Avila has on several occasions requested that other exhibits and/or portions of exhibits that were not admitted at trial be transmitted to this court in connection with this appeal.  In response to her second motion for reconsideration of this court's order regarding transmission of exhibits, we received the documents submitted with the motion and advised the parties that we would decide whether they were appropriate for inclusion in the appellate record in connection with this appeal.

Only exhibits "admitted in evidence, refused, or lodged" may be included in the record on appeal (Cal. Rules of Court, rules 8.122(b)(3)(B), 8.224(a)(1)), or considered by the appellate court unless the court grants leave to produce additional evidence on appeal (see Code Civ. Proc., § 909; *Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.* (1993) 12 Cal.App.4th 74, 87).  None of the documents transmitted to this court by Avila is appropriate for consideration by this

9

court.  Having reviewed the clerk's transcript to confirm which exhibits were admitted at trial, and absent any specific argument by Avila that any exhibits or portions thereof were erroneously excluded by the trial court, we conclude that none of the documents submitted to this court by Avila is properly part of the appellate record.

Additionally, prior to oral argument, Avila filed a request for judicial notice of various documents which she admits are not a part of the appellate record, but which were mentioned in the parties' briefs.  A motion for judicial notice on appeal must state: (1) why the matter is relevant to the appeal; (2) whether the trial court took judicial notice of the matter; (3) whether the matter is subject to judicial notice under Evidence Code sections 451, 452, or 453; and (4) whether the matter relates to proceedings after the judgment.  (Cal. Rules of Court, rule 8.252(a)(2).)

The materials attached to Avila's request for judicial notice include updates to her medical records, documents filed in connection with a separate malpractice lawsuit against Aszterbaum, and a list of radiology billing codes.  The documents filed in the separate malpractice action are court records and therefore may be the proper subject of judicial notice.  (Evid. Code, § 452, subd. (d).)  As they may have some relevance to the court's ruling on the motion in limine precluding evidence of other litigation involving Aszterbaum, we shall take judicial notice of these documents and consider them as appropriate.  However, as we will discuss later in this opinion, these documents cannot be considered to the extent they are inadmissible under Evidence Code section 1101, subdivision (a).

None of the other documents attached to Avila's request for judicial notice is the proper subject of judicial notice and none is relevant to the issues on appeal. Avila's updated medical records relate to events after the judgment was entered.  We deny the request for judicial notice as to these documents.

## II.

### SUBSTANTIAL EVIDENCE OF CONSENT

Avila argues that there was no substantial evidence to support the jury's finding that she gave informed consent to the BSO or that she otherwise consented to removal of her ovaries if Aszterbaum determined during surgery that there were abnormalities.

"'When a [jury]'s factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' [Citation.] The substantial evidence standard of review is applicable to appeals from both jury and nonjury trials." (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143.)[4]

---

[4] Avila argues in her reply brief that there is substantial evidence in the record from which the jury could have ruled in her favor. Avila's argument is contrary to the standard by which we review a jury's verdict. The question is not whether there is evidence to support a finding in Avila's favor, but whether there is substantial evidence to *support the findings actually made by the jury in favor of Aszterbaum.* Reversal of the jury's findings is not permissible just because there is also evidence to support Avila's position. Reversal is only permissible under the substantial evidence standard if, after reviewing the entire record, we conclude there is no substantial evidence supporting the verdict. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582; see *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503.) If there is substantial evidence supporting the jury's verdict, it does not matter that other evidence favoring Avila's position exists, or that we might have believed the evidence in Avila's favor had we been the trier of fact. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

As set forth in detail, *ante*, there was more than substantial evidence that Avila gave her informed consent to the BSO, and that Aszterbaum did not commit a medical battery on Avila. Avila signed three documents on two different days consenting to a BSO if Aszterbaum discovered anything abnormal during the surgery.[5] Aszterbaum also discussed with Avila her recommendation regarding the possibility of a BSO. During the surgery, Aszterbaum observed cysts on Avila's fallopian tubes; the cysts were abnormal. Although a postsurgical pathology report determined the cysts were benign, Aszterbaum's removal of Avila's ovaries and fallopian tubes based on the discovery of the cysts was neither a medical battery nor outside the scope of the consent Avila had provided.

In her appellate briefs, Avila cites extensively to her daughter, Anavictoria Avila's, videotaped deposition testimony regarding the consent forms. Although Avila lodged the transcript of her daughter's deposition as Exhibit 37 before trial, that exhibit was not admitted into evidence at trial, and Avila does not identify any place in the appellate record showing that she had attempted to read any portion of the deposition testimony into the record at trial.

In her reply brief, Avila argues that Aszterbaum did not obtain her informed consent because Aszterbaum did not disclose "all information relevant to a

---

As an appellate court, we defer to the jury's resolution of fact issues because the jury had the benefit of observing the demeanor of witnesses and was therefore in a better position than this court to assess the credibility of the witnesses. (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175-1176; *Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 931.) As a matter of jurisprudence, we must leave to the trial court the issue of deciding questions of fact, while we address questions of law. (*Tupman v. Haberkern* (1929) 208 Cal. 256, 262-263.)

[5] Avila contends that the interpreters at her deposition and at trial mistranslated her testimony regarding the conditions under which she would consent to the BSO. The translators at trial were certified by the court and the certifications were validated. When excerpts from Avila's deposition were read at trial, Avila did not object.

12

meaningful decisional process." (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 242.) In its special verdict, the jury found that Aszterbaum *did not* "fail to disclose to Carmen Avila the important potential results and risks of, and alternative to the possible [BSO]." The wording of the consent forms and Aszterbaum's testimony constitute substantial evidence supporting the jury's findings.

Avila also argues that Aszterbaum committed medical battery by exceeding the conditions of her consent. As explained *ante*, the consents addressed the possibility of the removal of Avila's ovaries and fallopian tubes. The testimony of Avila and Aszterbaum disagreed as to whether that removal would occur if Aszterbaum discovered something "abnormal" or something "cancerous." The jury was entitled to believe Aszterbaum, and it did; the jury therefore made findings that Avila's consent to the BSO was not conditioned on Aszterbaum finding that the ovaries were cancerous, but rather that Avila's consent to the BSO was conditioned on Aszterbaum "determin[ing] there were abnormalities as determined during the surgery."[6]

Avila states in her reply brief that, after trial was trailed to allow the parties to conduct settlement discussions, she "was not allowed to complete her testimony regarding claimed financial damages." The clerk's transcript reflects that settlement discussions occurred before the pretrial conference, and did not affect Avila's trial testimony in any way.

III.

EXCLUSION OF EVIDENCE OF OTHER LAWSUITS

Avila argues that the trial court erred by granting Aszterbaum's motion in limine to exclude evidence of other malpractice lawsuits against her. Aszterbaum

---

[6] Avila frequently quotes the trial court's statements regarding its decision to deny the nonsuit motion as to the lack of informed consent and medical battery causes of action to bolster her argument that she was entitled to judgment on those claims. Whether the evidence was sufficient to withstand a nonsuit motion does not mean a cause of action was proven.

correctly observes that Avila fails to support her argument with any authority or analysis. Although Avila did not separately raise this issue and support it with argument in her opening brief, we will consider the issue in this opinion because she did address the issue specifically in her reply brief. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Said v. Jegan* (2007) 146 Cal.App.4th 1375, 1384-1385.)

The trial court did not abuse its discretion in granting the motion in limine. Evidence that a doctor is unskilled, whether proven by reputation or by specific prior acts, is not admissible to prove he or she was negligent on a specific occasion. (Evid. Code, §§ 1101, subd. (a), 1104; *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 924; *Hinson v. Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, 1122, disapproved on other grounds in *Alexander v. Superior Court* (1993) 5 Cal.4th 1218, 1228, fn. 10.) The proffered evidence of other malpractice suits was an attempt to prove Aszterbaum was unskilled by showing her prior acts that lead other patients to sue for medical malpractice, and thus was inadmissible.

Avila contends that the trial court erred by failing to allow her to finish her oral argument at the hearing on the motion in limine. The court explained clearly to Avila why it was granting the motion in limine, and Avila twice replied that she understood.[7] The court did not cut off Avila's right to argue against the motion in limine, and she does not indicate on appeal what more she could have said.

As noted previously, we granted Avila's request for judicial notice as to the complaint, a minute order continuing a case management conference, and a request for dismissal of another lawsuit filed against Aszterbaum by a different plaintiff. While Avila would like to draw from these documents the inference that Aszterbaum has repeatedly performed surgery negligently, it would be impossible to reasonably do so. First, the only information we can discern from these documents is that Aszterbaum was

---

[7] Avila said: "I think you are correct in whatever you say would be okay," and "Once again I agree with you, but I'm concerned about the situation."

14

a medical professional involved in the treatment of another patient who later sued Aszterbaum for malpractice and that the lawsuit was eventually dismissed with prejudice. We cannot even determine from these documents that Aszterbaum performed any surgical procedure on this other patient, much less discern whether or how Aszterbaum might have acted negligently.  Second, Evidence Code section 1101 makes these documents inadmissible because no trier of fact should make assumptions about a medical professional's performance in one matter based on the claims of another patient in another matter.

## DISPOSITION

The judgment is affirmed.  In the interests of justice, neither party shall recover costs on appeal.


FYBEL, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MARKS, J.*

*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.